KING and PATRICK E. HIGGINBOTHAM, Circuit Judges:
For more than a century, general maritime law has held joint tortfeasors jointly and severally hable for all of the plaintiffs damages suffered at their hand. Under that rule, the risk of noncollection is borne by the defendants. The plaintiff can collect his entire judgment from a single defendant, leaving to the defendants allocation of fault among themselves. We reheard this case en banc to consider the contention that we should adopt a new rule of “modified joint liability.” This proposal would limit each joint tortfeasor’s maximum liability to the amount for which that tortfeasor would have been hable to the plaintiff if only the negligence of that tortfeasor and the neghgenee of the plaintiff were compared. The new rule would, for the first time in maritime history, shift the risk of noncolleetion to the plaintiff. It would allocate the risk of noncohection of an admiralty judgment among the contribu-torily-neghgent plaintiff and the defendants in proportion to their respective faults. Because replacing joint and several liability in the general maritime law with modified joint liability would be neither authorized nor prudent, we affirm the judgment of the district court.
I. FACTS AND PROCEDURAL BACKGROUND
The facts and procedural history of this case were set forth in the panel opinion, Coats v. Penrod Drilling Corp., 5 F.3d 877 (5th Cir.1993), cert. denied, — U.S. -, 114 S.Ct. 1303, 127 L.Ed.2d 654, reh’g en banc granted, 20 F.3d 614 (5th Cir.1994), and only those portions necessary to the issues discussed herein are restated.
Maritime Industrial Services is a corporation organized under the laws of Ras Al-Khaimah, United Arab Emirates with branch offices in Dubai and Abu Dhabi. It performs repair and maintenance services for oilfield and marine vessels, and its employees are all expatriates, primarily from India, Pakistan, and the United States. MIS uses Lee’s Materials Services, Inc. in Houston, Texas to perform various services in the United States. Through Lee’s, MIS advertised its job openings in the Houston Chronicle (Texas), Lafayette Advertiser (Louisiana), and Mobile Register (Alabama).
In 1987, David Shelton, manager of the Hytorc Division of MIS, travelled from the United Arab Emirates to Mississippi on vacation and to interview prospective employees for MIS. During his trip, Shelton held a *1117 meeting in Laurel, Mississippi that was attended by several young men, including the plaintiff, Earl Wayne Coats. Shelton explained that he was soliciting employees to operate MIS equipment on certain offshore vessels. At the meeting, Shelton offered a job to Coats, and Coats accepted. Their agreement included thirty days per year of paid vacation with airfare back to Mississippi. MIS also promised to pay for Coats’ return to Mississippi at the termination of his employment. The term of Coats’ employment was indefinite. Coats obtained an updated passport as instructed by Shelton, and MIS, through Lee’s, sent him a plane ticket to Dubai. Coats arrived in the United Arab Emirates and started work on December 1, 1987.
While working for MIS, Coats lived on shore and worked on various jack-up rigs owned by different customers of MIS. The majority of Coats’ work consisted of operating a hydraulically powered torque wrench used to loosen and tighten large nuts and bolts. During Coats’ employment with MIS, Penrod Drilling Corporation, a Delaware corporation with its principal place of business in Dallas, Texas, contracted for MIS to perform pressure testing on Penrod’s Rig 69. The pressure testing was necessary to prepare the rig for its next drilling operation. At the time, Rig 69, a jack-up drilling rig, was located in the Port of Mina Saqr in the territorial waters of the United Arab Emirates. Although it was twenty feet from shore in forty feet of water and connected to land by a gangway, it was prepared to sail and did so three days after the accident. Rig 69 flies the United States flag, and its home port is New Orleans, Louisiana. Penrod maintained a local office in the United Arab Emirates to assist in the operation of Rig 69.
MIS assigned Coats to perform the pressure testing for Penrod. Coats was inexperienced at this task and had to ask for assistance from Penrod personnel. All safety procedures were prepared to meet standards of the United States. As Coats was working aboard Rig 69, Penrod’s bullplug failed at a pressure less than it was rated to withstand, causing the fluid under pressure to erupt. The eruption knocked Coats down, resulting in a severe and disabling injury to his knee. After the accident, MIS flew Coats to Hat-tiesburg, Mississippi for treatment and started paying his medical expenses. Most of these payments were made through Lee’s. Meanwhile, MIS filled Coats’ job with Chris Stennett, another Mississippi resident who attended Shelton’s meeting in Laurel.
On April 10, 1989, Coats sued Penrod, MIS, and Lee’s[1] in the Southern District of Mississippi. The complaint asserted federal jurisdiction based on diversity of citizenship and admiralty and alleges, inter alia, negligence on the part of Penrod and MIS, the unseaworthiness of Rig 69, and entitlement to maintenance and cure from MIS under the Jones Act. Soon thereafter, MIS terminated its payment of benefits to Coats. Coats then amended his complaint against MIS to seek compensatory and punitive damages under the general maritime law for wrongful termination of maintenance and cure and to allege wrongful termination of health insurance benefits under ERISA. Penrod cross-claimed against MIS for indemnity and contribution under the general maritime law.
Before trial, the district court issued a number of orders in response to motions filed by the parties. The court ruled that MIS had sufficient contacts with Mississippi to justify the assertion of personal jurisdiction and that it would apply United States law, rather than the law of the United Arab Emirates, to Coats’ personal injury claims. MIS was estimated to be doing over one million dollars a year of business in Texas at the time of the accident. Under American law, the court determined that Coats was not a Jones Act seaman and was not entitled to maintenance and cure (and associated damages), but the court found that Coats qualified as a Sieracki seaman with the attending right to sue under the warranty of seaworthiness. See Seas Shipping Co. v. Sieracki, 328 *1118 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).[2] The court also declined to dismiss the case under the doctrine of forum non conveniens.
The case proceeded to trial on Coats’ claims against Penrod for negligence and unseaworthiness and against MIS for negligence, wrongful termination of maintenance and cure, and wrongful termination of benefits under ERISA. After the court directed a verdict against Coats on his claim for punitive damages based on MIS’ termination of maintenance and cure, the jury returned a verdict for Coats, assessing damages of $925,000 and assigning 20% fault to Coats, 20% to Penrod, and 60% to MIS. The court reduced the award by Coats’ comparative fault to $740,000 and entered judgment against Penrod and MIS jointly and severally. The court also awarded costs to Coats in the amount of $7,889.04. In addition, the court awarded Coats $26,524.82 in penalties against MIS alone for its wrongful nonpayment of benefits as required by ERISA. MIS did not contest on appeal its liability under ERISA for benefits payable to Coats under his contract of employment. All parties appealed.
In this opinion we address only the choice of law issue and Penrod’s proposal for modified joint liability. The portions of the panel opinion addressing personal jurisdiction over MIS (Part II), see Coats, 5 F.3d at 881-85; forum non conveniens (Part IV), see id. at 889; and Coats’ cross-appeal (Part VI), see id. at 890-92, are reinstated.
II. CHOICE OF LAW
A. Subject Matter Jurisdiction in Admiralty
Turning to the district court’s application of United States law, MIS first argues that the choice of law is between the law of the United Arab Emirates and Mississippi law, rather than the general maritime law. This conclusion rests on the contention that the district court lacked subject matter jurisdiction in admiralty, and therefore, the only basis for federal jurisdiction is diversity. If so, the district court should have applied Mississippi’s choice of law rules in deciding between foreign and state law. See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941); Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).[3] MIS asserts that Mississippi would apply the law of the United Arab Emirates to this ease.[4]
MIS argues that the activity giving rise to Coats’ accident does not have a sufficient connection to traditional maritime activity to support admiralty tort jurisdiction. See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., — U.S. -, -, 115 S.Ct. 1043, 1048, 130 L.Ed.2d 1024 (1995); Sisson v. Ruby, 497 U.S. 358, 365, 110 S.Ct. 2892, 2897, 111 L.Ed.2d 292 (1990); Foremost Ins. Co. v. Richardson, 457 U.S. 668, 674, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300 (1982); Executive Jet Aviation, Inc. v. Cleveland, 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972). While this circuit formerly applied a multi-factor approach to determine whether there was a substantial relationship to traditional maritime activity, see, e.g., Kelly v. Smith, 485 F.2d 520, 525 (5th Cir.1973), cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974), that approach was rejected by the Supreme Court in Grubart. According to Grubart, the “connection” inquiry for admiralty tort jurisdiction involves two inquiries. A court must first “assess the general features of the type of incident involved to determine whether the *1119 incident has a potentially disruptive impact on maritime commerce.” Grubart, — U.S. at-, 115 S.Ct. at 1048 (citations omitted) (internal quotations omitted). Second, a court must determine “whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.” Id. (citations omitted) (internal quotations omitted). For this second inquiry, we ask “whether a tort-feasor’s activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the case at hand.” Id. at-, 115 S.Ct. at 1051.
MIS performs repair and maintenance services for oilfield and marine vessels. Penrod is engaged in offshore oil drilling. Penrod contracted with MIS because Rig 69 needed pressure testing before its next drilling operation. As to the first “connection” inquiry, the incident can be described in general terms as an injury to a worker while repairing and maintaining a jack-up rig in navigable waters. Without a doubt, worker injuries, particularly to those involved in repair and maintenance, can have a disruptive impact on maritime commerce by stalling or delaying the primary activity of the vessel. As to the second inquiry, the repair and maintenance of a jack-up drilling rig on navigable waters is certainly a traditional maritime activity. Moreover, we note that this tort occurred aboard a vessel on navigable waters. Providing compensation for shipboard injuries is a traditional function of the admiralty laws. See Sisson, 497 U.S. at 368-75, 110 S.Ct. at 2898-2902 (Scalia, J., concurring) (arguing that all vessel-related torts fall within the admiralty jurisdiction).. Thus, the activity giving rise to Coats’ accident has a sufficient connection to traditional maritime activity to support exercise of our admiralty tort jurisdiction.
MIS’ reliance on Sohyde Drilling & Marine Co. v. Coastal Gas Producing Co., 644 F.2d 1132 (5th Cir.1981), is misplaced. There, we applied the Kelly factors and concluded that admiralty jurisdiction was lacking in a suit for property damage arising from the blowout of a high-pressure gas well locat-
ed in a dead-end canal slip in Louisiana. Coastal, the operator of the well, had hired Sohyde to perform workover operations to correct a loss of production. While denying jurisdiction over the property damage at issue, the court remarked that claims for personal injury suffered on navigable waters would certainly fall within admiralty. Id. at 1136-37. Therefore, Sohyde actually supports the exercise of admiralty jurisdiction in this case, one involving only personal injury. MIS’ arguments are without merit.
B. The Lauritzenr-Rhoditis Factors
The Lauritzen-Rhoditis factors govern the choice of law: (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured worker; (4) the allegiance of the defendant shipowner; (5) the place of the contract; (6) the inaccessibility of the foreign forum; (7) the law of the forum; and (8) the shipowner’s base of operations. Hellenic Lines, Ltd. v. Rhoditis, 398 U.S. 306, 308-09, 90 S.Ct. 1731, 1733-34, 26 L.Ed.2d 252 (1970); Lauritzen v. Larsen, 345 U.S. 571, 583-91, 73 S.Ct. 921, 928-33, 97 L.Ed. 1254 (1953). “The test is not a mechanical one in which the court simply counts the relevant contacts; instead, the significance of each factor must be considered within the particular context of the claim and the national interest that might be served by the application of United States law.” Fogleman v. ARAMCO, 920 F.2d 278, 282 (5th Cir.1991). “The significance of each factor in a nontraditional maritime context like offshore oil production may vary from that in the traditional shipping context in which the Lauritzenr-Rhoditis test arose.” Id.; see also Bailey v. Dolphin Int’l, Inc., 697 F.2d 1268, 1275 (5th Cir.1983) (involving a jack-up drilling rig); Cuevas v. Reading & Bates Corp., 770 F.2d 1371 (5th Cir.1985) (same); Jack L. Albritton, Choice of Law in a Maritime Personal Injury Setting: The Domestic Jurisprudence, 43 La.L.Rev. 879 (1983) (discussing the difference between “bluewater” and “brownwater” cases). The place of the wrongful act, the allegiance or domicile of the injured, and the place of the contract, which are less important in the shipping context, are more significant in nontraditional cases such as this one. Chiazor v. Transworld *1120 Drilling Co., 648 F.2d 1015, 1019 (5th Cir.1981). Our review of the district court’s decision to apply United States law is de novo. See, e.g., Fogleman, 920 F.2d at 282.
The first factor is the place of the wrongful act. Coats’ accident occurred in the territorial waters of the United Arab Emirates, and because this is a nontraditional maritime case, this factor is entitled to considerable weight.
The second factor is the law of the flag. “The law of the flag has traditionally been of cardinal importance in determining the law applicable to maritime eases.” Id. (citing Lauritzen, 345 U.S. at 583-84, 73 S.Ct. at 928-29). MIS is not a shipowner and therefore this factor has no specific application to it. Penrod’s Rig 69 flew the United States flag. Penrod argues that the flag of the vessel in this case is fortuitous, because Coats was assigned to six different drilling rigs with different owners and allegiances. The record indicates that in addition to the PENROD 69, Coats worked aboard the MARESK VICTORY, the TRIDENT III, the TRANSOCEAN V, the W.T. ADAMS, and the SEDCO 91. Penrod, however, does not say what flag each of these vessels flew and we are unable to find this information in the record. We cannot conclude that Coats’ injury aboard a United States flag vessel, as opposed to a vessel registered in another country, was fortuitous without knowing what flags these other rigs flew.
The third factor is the allegiance or domicile of the plaintiff. Coats is a United States citizen, and despite his move overseas, he maintained his residence in Mississippi, where MIS agreed to fly him for his vacations, and where he returned after the accident. Indeed, MIS purchased insurance to pay costs of “repatriation” in the event of an accident. Nevertheless, defendants contend that Coats’ domicile was in the United Arab Emirates. They argue that he moved to that country with the intent to remain because his job with MIS was for an indefinite term and one is generally domiciled where he works. In Fogleman, however, the plaintiff was a Louisiana resident who had worked in Saudi Arabia for eight years, and we determined his domicile to be in the United States. Coats is, a fortiori, domiciled in the United States.
Fourth is the allegiance of the defendant shipowner. Penrod’s allegiance is without question to the United States. Rig 69 flies the United States flag and Penrod’s principal place of business is Dallas, Texas. MIS is not a shipowner, but we still take into account its organization under the laws of the United Arab Emirates.
The place of the contract is the fifth factor, and another that is here entitled to weight. As the district court stated, Coats apparently executed an Arabic contract in the United Arab Emirates for the purpose of obtaining a work visa; however, the parties agreed to all of the contract terms in Mississippi. Thus, as the district court clearly found, Coats’ employment contract was formed in Mississippi, and this factor favors United States law. Cf. Fogleman, 920 F.2d at 283 (noting that plaintiff signed all eight of his contracts in Saudi Arabia).
The sixth factor, inaccessibility of the forum, is only relevant to forum non conveniens. Lauritzen, 345 U.S. at 589-90, 73 S.Ct. at 931-32. The seventh factor is the law of the forum; here, general maritime law. Fogleman, 920 F.2d at 283.
The final factor is the base of operations. In the nontraditional context, we have held that “ ‘it is the base from which the rig is operated on a day-to-day basis rather than the base of operations of the corporate or ultimate owner of the rig which is important for choice of law purposes.’” Id. at 284 (quoting Bailey, 697 F.2d at 1275 n. 22). Penrod has a local office in the United Arab Emirates to assist in the operation of Rig 69. The record shows that this office is occupied by the rig superintendent who frequently communicates with Penrod’s office in Dallas, Texas by facsimile. We addressed a similar situation in Bailey. There, the local office in Singapore “was in daily contact with the Houston office by telex or telephone, usually providing it with drilling reports.” 697 F.2d at 1271 n. 6. In addition, “the day-to-day decisions respecting the activities and operations of the [rig] were made by [the area *1121 manager] or [the rig manager and drilling superintendent] or by personnel on the rig.” Id. We nevertheless agreed that the base of operations was not in the United States. Id. at 1274. Therefore, we are constrained to find that Penrod’s base of operations for purposes of this case is in the United Arab Emirates. MIS’ base of operations is also in the United Arab Emirates; it has no offices anywhere else. Despite the business it conducts through Lee’s in the United States and the fact that it has a substantial number of American employees, its day-to-day operations are conducted in the United Arab Emirates.
Considering these factors and weighing them in this offshore oil drilling context, we agree with the district court’s decision to apply general maritime law. Of the factors deemed more significant in this context, only the place of the wrongful act favors foreign law; the allegiance of the plaintiff and the place of contract refer us to United States law. The law of the flag and the allegiance of the defendant shipowner also point to United States law. In short, the United States has a greater interest in applying its law to this case than the United Arab Emirates. Coats was recruited in the United States, accepted the job while in this country, was supervised by American employees, suffered injury aboard an American vessel, and was flown home to recover. After his return, MIS willfully terminated benefits due Coats under ERISA, resulting in liability that it never questioned on appeal. See Albritton, Choice of Law, supra (noting the unlikelihood of courts denying the benefit of American maritime law to an American citizen who is recruited to work overseas and does not give up his permanent United States residence).
Prior cases are less instructive in such a fact-specific inquiry as here. Regardless, our decision today is consistent with precedent. With one exception, our decisions involving nontraditional, “brownwater” vessels have involved a foreign plaintiff injured off the coast of a foreign country seeking the protections of American law. We have uniformly rebuffed these attempts. See, e.g., Cuevas v. Reading & Bates Corp., 770 F.2d 1371 (5th Cir.1985); Koke v. Phillips Petroleum Co., 730 F.2d 211 (5th Cir.1984); Bailey v. Dolphin Int’l, Inc., 697 F.2d 1268 (5th Cir.1983); Vaz Borralho v. Keydril Co., 696 F.2d 379 (5th Cir.1983); Chiazor v. Transworld Drilling Co., 648 F.2d 1015 (5th Cir.1981).
The one exception is Fogleman, where we refused to allow an American plaintiff to sue under United States law for an injury that occurred in Saudi Arabia. Fogleman, a Louisiana resident, went to work for Fluor Arabia in Saudi Arabia. He applied for the job by completing a “Foreign Employment Application” and mailing it to Saudi Arabia. Fluor Arabia is a subsidiary of Fluor Corporation, a Delaware corporation with its principal place of business in California, but is only authorized to do business in Saudi Arabia. Fogleman worked under a series of eight one-year contracts, all signed in Saudi Arabia, and lived aboard a boat flying the Saudi Arabian flag. Fluor Arabia had a contract with ARAMCO, and pursuant to that contract, Fluor Arabia assigned Fogle-man to work with ARAMCO. Fogleman sustained a sharp pain in his chest while transferring from an oil platform to a workboat that flew the Panamanian flag and later suffered a heart attack, allegedly caused by excessive work hours aboard ARAMCO’s oil platform. Fogleman sued ARAMCO and Fluor Arabia, and we affirmed the district court’s application of Saudi Arabian law to ARAMCO and Fluor Corporation. 920 F.2d at 281.
The contacts with the United States in Fogleman were not as strong as in this case. The vessels involved did not fly the United States flag, and all of the plaintiffs’ contracts were signed in the foreign country. Moreover, the allegiance of both defendants was foreign. Id. at 282-83. “[T]he only significant factor pointing to the application of United States law [was] the domicile of the plaintiff.” Id. at 284. We are persuaded that the connections with the United States in this ease are substantial and require a different result than Fogleman.
III. JOINT AND SEVERAL LIABILITY
Penrod argues that traditional joint and several liability, under which even a con- *1122 tributorily-negligent plaintiff may recover his entire damages award from any defendant held to be partially responsible, has no place in a world where comparative negligence is the norm. Penrod points out that under the present scenario, Coats, who was found by the jury to be 20% responsible for his injuries, will be able to satisfy 100% of his judgment from the equally-negligent Penrod.[5] In Penrod’s view, Coats should have to bear part of the risk that the judgment against MIS, found 60% responsible for Coats’ injuries, may be wholly or partially uncollectible.[6] Consequently, Penrod seeks to modify the district court’s judgment by limiting Coats’ ability to recover the entire judgment from either Penrod or MIS in proportion to Coats’ own contributory negligence. To accomplish this change in the judgment, Penrod advocates the adoption of modified joint liability in the general maritime law. According to Penrod, the modified joint liability proposal is a fairer allocation of the responsibility of each party, and is consistent with developments in the state law that have abolished or modified traditional joint and several liability. To understand why we reject the invitation to adopt modified joint liability, we must begin by understanding the changes that the proposal would work in the general maritime law.
A. Understanding the Proposal
Penrod’s modified joint liability proposal adopts an approach advocated sixty years ago by Charles 0. Gregory, a professor of law at the University of Chicago. See Charles O. Gregory, Legislative Loss Distribution in Negligence Actions, 77-79, 142-48 (1936). Judge Garwood in turn advocated Professor Gregory’s approach, using the example of a three-car accident in which all three parties — plaintiff A, defendant B, and defendant C — are equally at fault: “the risk that C will not compensate plaintiff A ... is borne by A and B in the respective ratios that the fault of each of them bears to the total fault of both.” Simeon v. T. Smith & Son, Inc., 852 F.2d 1421, 1436-48 (5th Cir.1988) (Garwood, J., concurring in part and dissenting in part), cert. denied, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). The court would divide B’s negligence by A’s and B’s combined negligence (A + B) to calculate the extent of B’s maximum liability, which in this hypothesis would be 50%, or 33%/66%. Thus, at a maximum, A can collect from B half of the damages awarded — rather than the two-thirds A would have been able to collect from B under traditional joint and several liability. B would then have a contribution claim against C for that amount of the judgment it actually pays over its $ share of fault.
The jury here awarded total damages of $925,000 and found the plaintiff, Coats, to be 20% responsible, Penrod to be 20% responsible, and MIS to be 60% responsible. The adoption of Penrod’s modified joint liability proposal would provide Coats with a judgment that includes a joint liability component and a several liability component against each defendant.[7] Penrod’s proposal would work as follows:
Penrod’s maximum liability would be $462,500:
20 X 925,000
20 + 20
(Penrod’s negligence divided by the sum of Penrod’s and Coats’ negligence, multiplied by the total damages award)
Similarly, MIS’ maximum liability would be $693,750:
60 X 925,000
20 + 60
(MIS’ negligence divided by the sum of MIS’ and Coats’ negligence, multiplied by the total damages award)
*1123 The trial court would then subtract MIS’ maximum liability ($693,750) from the amount Coats can collect ($740,000)[8] to arrive at $46,250 for which Penrod is solely liable. This $46,250 figure is Penrod’s several liability component. Similarly, when Pen-rod’s maximum liability ($462,500) is subtracted from the total amount that Coats can collect ($740,000), MIS is solely liable for $277,500 of the judgment. This $277,500 figure is MIS’ several component. Finally, Penrod’s and MIS’ joint liability component ($416,250) is calculated by subtracting the sum of Penrod’s sole liability ($46,250) and MIS’ sole liability ($277,500) from Coats’ maximum overall recovery ($740,000).[9]
Coats could pursue Penrod for the amount of Penrod’s maximum liability ($462,500), and then seek recovery from MIS for the remaining $277,500 ($740,000 — $462,500) that Coats can collect. Because Penrod would have paid more ($462,500) than its 20% share of fault ($185,000),[10] Penrod would have a contribution claim against MIS for the extra $277,500 ($462,500 — $185,000) in damages that it paid over to Coats. Similarly, Coats could pursue MIS for the amount of MIS’ maximum liability ($693,750), and then seek recovery from Penrod for the remaining $46,250 ($740,000— $693,750) that Coats can collect. Because MIS would have paid more than its 60% share of fault ($555,000),[11] MIS would have a contribution claim against Penrod for the extra $138,750 ($693,750 - $555,000) in damages that it paid over to Coats.
The modified joint liability proposal benefits defendants. Penrod would be liable for $740,000 under traditional joint and several liability, but only for $462,500 under modified joint liability. On the other hand, the proposal hurts plaintiffs, because full recovery of damages is harder to get under modified joint liability than under the traditional scheme. Mathematically, “[s]ince a defendant’s joint liability would become defined by a sum which is less than the total amount of the defendants’ combined liabilities, a plaintiff could recover the total amount he is owed only by enforcing the judgment against each and every defendant.” Simeon, 852 F.2d at 1449 (King, J., specially concurring). It also goes without saying that the plaintiff will have to expend additional effort and money to collect the award from two different defendants, a circumstance which becomes more expensive with each additional co-defendant. Furthermore, in the event that one defendant is statutorily immune, insolvent, or otherwise judgment-proof, the plaintiff will receive less than his total recoverable damages as found by the trier-of-fact, even if he recovers against all remaining defendants. For example, at best, Coats would receive only 63% of his maximum recovery ($462,000/$740, 000) if MIS is insolvent or otherwise judgment-proof. Although there is no evidence of insolvency or uncollectibility in the case before us, Penrod and the proponents of modified joint liability justify this result by arguing that a partially-negligent plaintiff, such as Coats, should bear part of the risk of noncollection, rather than placing the entire burden upon the defendants.[12]
*1124 B. The Case for Modified Joint Liability
Penrod asserts that modified joint liability should be adopted for two basic reasons. First, Penrod argues, the traditional rule of joint and several liability was not intended to apply to a contributorily-negligent plaintiff. As Penrod sees it, the removal of the requirement that the plaintiff be wholly innocent has unfairly allowed a eontributorily negligent plaintiff to recover the entire judgment from a defendant whose fault is minuscule. Second, Penrod notes that the general maritime law has been responsive to changes in the common law and to legislative enactments. In light of the modifications to joint and several liability enacted by many states, Penrod argues that admiralty courts should change the general maritime law to respond to these developments. We disagree with both of these contentions.
1. The traditional rule of joint and several liability
The traditional rule of joint and several liability can be traced back to eighteenth century England and the case of Hill v. Goodchild, 98 Eng.Rep. 465, 5 Buff. 2790 (K.B.1771). The rule was derived from the principle that a cause of action was “unitary,” and therefore, apportionment of damages by the jury was not permitted. See W. Page Keeton et al., Prosser and Keeton on The Law of Torts § 46, at 323 & n. 5 (5th ed. 1984) [hereinafter “Prosser & Keeton”] (collecting cases). Consequently, it was impossible to impose upon the individual defendants anything less than entire liability. See Larry Pressler & Kevin V. Schieffer, Joint and Several Liability: A Case for Reform, 64 Denv.U.L.Rev. 651, 655 (1988).
Originally, joint and several liability was confined to situations where the joint tortfea-sors acted “in concert.” See Pressler & Schieffer, supra, at 660; see also Prosser & Keeton, supra, § 46, at 322-23. The rule was combined with the common-law rules of procedural joinder, which were limited in application to tortfeasors acting “in concert.” Consequently, under the restricted joinder rules, defendants could not be joined, and joint liability could not be imposed, unless the defendants had in fact acted together to cause the harm. This circumstance apparently led the American courts to equate “joinder” and “joint liability.” See Pressler & Schieffer, supra, at 660; see also id. (“At common law, the concepts of procedural join-der and joint and several liability were indis *1125 tinguishable because there could be no join-der of parties unless it was alleged that they were jointly responsible for acts done in concert.”)-
A separate rationale of imposing “entire liability” developed alongside the concept of joint liability for those acting “in concert.” Under this corollary reasoning, “a defendant might be liable for the entire loss sustained by the plaintiff, even though the defendant’s act concurred or combined with that of another wrongdoer to produce the result or, as the courts have put it, that the defendant is liable for all consequences proximately caused by the defendant’s wrongful act.” Prosser & Keeton, supra, § 47, at 328. This notion reflected the belief that a tortfeasor should be responsible for all consequences stemming from his actions, regardless of the fortuitous circumstance that others may also have contributed to the injury.
By 1876, the common-law rule of joint and several liability was being discussed in the admiraltv settine[1]:
Nothing is more clear than the right of a plaintiff, having suffered such a loss, to sue in a common-law action all the wrongdoers, or any one of them, at his election; and it is equally clear, that, if he did not contribute to the disaster, he is entitled to judgment in either case for the full amount of his loss. He may proceed against all the wrong-doers jointly, or he may sue them all or any one of them separately.... Acts wrongfully done by the co-operation and joint agency of several persons constitute all the parties wrong-doers, and they may be sued jointly or severally; and any one of them, said Spencer, C.J., is liable for the injury done by all....
The Atlas, 93 U.S. 302, 315, 23 L.Ed. 863 (1876). In this context, as in others, the concern that the innocent plaintiff receive full recovery of his damages was offered as one of the primary justifications for joint and several liability. In fact, as we will explain, this consideration has apparently taken on an elevated significance in maritime law because of special concerns unique to the admiralty, especially its role as “protector” of seamen. Joint and several liability has the benefit of allowing a seaman to pursue and to collect his entire damages award from one co-defendant when the generally international character of his profession might make it difficult or impossible to locate or to collect from other tortfeasors.
Penrod argues that joint and several liability was “historically one of two counterbalancing principles arising out of the legal theory of the 19th Century that all parties are responsible for all of the consequences of their negligence.” According to Penrod, the “second half’ of this couplet is the concept of contributory negligence, which at common law would cut off all recovery for the partially-responsible plaintiff. Thus, only a wholly-innocent plaintiff had the advantage of collecting his entire damages award from any of the jointly liable defendants. As Penrod argues, when the tide of comparative negligence swept the nation, and a plaintiffs own negligence was no longer an absolute bar to recovery, the balance of the “couplet” was destroyed. Thus, because joint and several liability was born in the context of the wholly-innocent plaintiff, Penrod argues that it should be limited to that context.[13]
In support of its position, Penrod points to The Atlas, contending that it was the first case to adopt joint and several liability in admiralty. See The Atlas, 93 U.S. at 314 (“[P]roof of entire innocence or freedom from fault ... entitles the promoter of a suit for such a claim to full compensation for his loss from the guilty party.”). While The
*1126 Atlas may have been such a foundational case, see Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 260 n. 7, 99 S.Ct. 2753, 2756 n. 7, 61 L.Ed.2d 521 (1979) (“We stated the common-law rule in The Atlas and adopted it as part of admiralty jurisprudence.... ”), Penrod’s position is simply not compelling because its statement of history is incomplete. The move to comparative negligence in maritime personal injury law occurred over a century ago with the decision in The Max Morris, 137 U.S. 1, 14-15, 11 S.Ct. 29, 32-33, 34 L.Ed. 586 (1890).[14] See also Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 429, 59 S.Ct. 262, 265-66, 83 L.Ed. 265 (1939); The Arizona v. Anelich, 298 U.S. 110, 122, 56 S.Ct. 707, 711, 80 L.Ed. 1075 (1936); Prosser & Keeton, supra, § 67, at 471 (“Outside of admiralty, comparative negligence did not appear in American jurisprudence until the early twentieth century.”). Indeed, as early as 1920, the rale of comparative negligence was incorporated into the Jones Act and into the Death on the High Seas Act. See 46 U.S.C. § 688 (Jones Act); 46 U.S.C. § 766 (DOH-SA); see also United States v. Reliable Transfer Co., 421 U.S. 397, 408 n. 13, 95 S.Ct. 1708, 1714 n. 13, 44 L.Ed.2d 251 (1975) (noting that comparative negligence is applicable under the Jones Act and under DOHSA). The move to comparative negligence, however, did not abrogate admiralty’s application of joint and several liability, and the two doctrines have continued to work side-by-side in the maritime law. Three Supreme Court decisions strongly support this proposition, and Penrod points to no decision, Supreme Court or otherwise, to the contrary.[15]
In Pope & Talbot, Inc. v. Hawn, Hawn, a carpenter, was working for Haenn, an independent contractor, aboard Pope & Talbot’s ship. See 346 U.S. 406, 407, 74 S.Ct. 202, 203-04, 98 L.Ed. 143 (1953). After suffering injuries on the ship, Hawn brought a negligence and unseaworthiness action against Pope & Talbot under general maritime law. Id, Pope & Talbot impleaded Haenn and sought contribution or indemnity. The district court rendered judgment against Pope & Talbot for 100% of the damages less 17.5% for the proportion due to plaintiffs fault. It also awarded contribution to Pope & Talbot for Haenn’s share of fault. See id. at 408, 74 S.Ct. at 204. The court of appeals affirmed Hawn’s judgment against Pope & Talbot, but reversed the judgment of contribution because there was no right of contribution in *1127 such cases. See id. The Supreme Court affirmed the application of joint and several liability even though Pope & Talbot had no right of contribution against Haenn and even though Hawn was at fault. In other words, the Court treated comparative fault as consistent with traditional joint and several liability. The plaintiff was responsible for his own share of comparative fault, but the risk of noncollection fell on defendants, rather than on an injured victim.
In Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), Edmonds, the plaintiff longshoreman, was injured on a ship not owned by his employer stevedoring company. See id. at 258, 99 S.Ct. at 2755. He received benefits from his employer under the Long-shore and Harbor Workers’ Compensation Act (LHWCA), and he additionally brought a negligence action against the shipowner under 33 U.S.C. § 905(b) — a provision of the LHWCA added by Congress in 1972 to specifically authorize such suits. See id. The jury apportioned the $100,000 of damages as follows: 10% to the plaintiff, 20% to the shipowner, and 70% to the stevedoring company. The trial court reduced the award by the amount of the plaintiffs negligence, but the court could not permit Edmonds to recover any of the judgment from the employer stevedoring company because the employer was not a party to the suit, as the LHWCA had specifically limited its liability. See id. at 261, 99 S.Ct. at 2756-57. Consequently, at the end of the day, the shipowner, whose conduct was determined to have caused only 20% of the harm, was held to be liable for 90% of the entire judgment — even though it had no contribution rights against the statutorily-immune stevedore.
The shipowner made two arguments to the Supreme Court: (1) that in the process of specifically authorizing negligence suits against shipowners through the LHWCA’s 1972 amendments, Congress limited a shipowner’s liability to only that proportion of the plaintiffs damages which the shipowner actually caused — in this case, 20%; and (2) that even if Congress did not decree proportionate liability, the Supreme Court should, using its authority to fashion the general maritime law, limit the shipowner’s liability to its proportionate share of the longshoreman’s damages.
The Supreme Court began its examination of the arguments by remarking that “[a]dmi-ralty law is judge-made law to a great extent,” and by commenting that prior to 1972, a longshoreman’s negligence action against a shipowner was recognized by general maritime law, not by statute. See id. at 259-60, 99 S.Ct. at 2756. As the Court explained, prior to 1972, the general maritime law fashioned an injured plaintiffs recovery pursuant to the principles of joint and several liability. See id. at 260 & n. 7, 99 S.Ct. at 2756 n. 7. Importantly, the Court made it clear that the contributory negligence of a plaintiff had never changed the traditional rule:
As [admiralty law] had evolved by 1972, a longshoreman’s award in a suit against a negligent shipowner would be reduced by that portion of the damages assignable to the longshoreman’s own negligence; but, as a matter of maritime tort law, the shipowner would be responsible to the longshoreman in full for the remainder, even if the stevedore’s negligence contributed to the injuries. This latter rule is in accord with the common law, which allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor’s negligence was a substantial factor in causing, even if the concurrent negligence of others contributed to the incident.
Id. at 259-60, 99 S.Ct. at 2756.
After establishing the state of the law pri- or to the LHWCA’s 1972 amendments, the Court turned its attention to the amendments themselves and to their effect on the judicially-created doctrine of joint and several liability. An analysis of the amendments led the Court to conclude that Congress had not upset the “long-established and familiar principle] of maritime law by imposing a proportionate-fault rule.” Id. at 263, 99 S.Ct. at 2758 (internal quotation omitted). The Court moved, therefore, to the remaining issue of whether it should make the vessel liable only for the damages in proportion to its own negligence when a longshoreman sues the vessel owner for negligence under *1128 the LHWCA. See id. at 271, 99 S.Ct. at 2762. To this question, the Court answered “no”:
[W]e are mindful that here we deal with an interface of statutory and judge-made law.... By now changing what we have already established that Congress understood to be the law, and did not itself wish to modify, we might knock out of kilter this delicate balance. As our cases advise, we should stay our hand in these circumstances. Once Congress has relied upon conditions that the courts have created, we are not as free as we would otherwise be to change them. A change in the conditions would effectively alter the statute by causing it to reach different results than Congress envisioned.
Id. at 271-73, 99 S.Ct. at 2762-63 (citations omitted) (footnote omitted).[16]
Furthermore, the Court’s more recent decision in McDermott, Inc. v. AmClyde, — U.S. -, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994), again recognized the continued application of joint and several liability in the general maritime law. At issue in McDer-mott was the proper method of accounting for a settlement with certain defendants in the calculation of the amount of a plaintiffs injuries for which non-settling defendants could be held hable at trial. See id. at-, 114 S.Ct. at 1463. The Court adopted a “proportionate share” settlement rule that would diminish the claim of the injured party against the remaining defendants in proportion to the settling defendant’s share of fault, as found by the trier-of-fact. See id. at -, 114 S.Ct. at 1470-72. The Court was persuaded that the proportionate share approach was superior to other options, in part because it was consistent with the Court’s previous decision in United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). In Reliable Transfer, the Supreme Court adopted a rule requiring the assessment of damages on the basis of proportionate fault, and the Court abandoned a century-old “divided damages” rule, whereby property damages were divided equally among co-defendants, primarily in collision cases, without regard to their relative degrees of fault. See id. at 410-11, 95 S.Ct. at 1715-16.
The respondents in McDermott argued that the proportionate share approach was inconsistent with the Court’s earlier decision in Edmond,s, as joint and several liability was applied in Edmonds, and no reduction in the shipowner’s judgment was made for the proportionate fault attributed to the stevedore. See McDermott, — U.S. at-, 114 S.Ct. at 1471. In rejecting the argument, the McDermott Court noted that Edmonds was “primarily” a LHWCA statutory construction case, but the Court also observed that:
one can read [Edmonds] as merely reaf-ñrming the well-established principle of joint and several liability. As the Court pointed out, that principle was in no way abrogated by Reliable Transfer’s proportionate fault approach.... [Tjhere is no *1129 tension between joint and several liability and a proportionate share approach to settlements. Joint and several liability ... can result in one defendant’s paying more than its apportioned share of liability when the plaintiff’s recovery from other defendants is limited by factors beyond the plaintiff’s control, such as a defendant’s insolvency.... Unlike the rule in Edmonds, the proportionate share rule announced in this opinion only applies when there has been a settlement. In such cases, the plaintiffs recovery against the settling defendants has been limited not by outside forces, but by its own agreement to settle. There is no reason to allocate the shortfall to the other defendants, who were not parties to the settlement.
— U.S. at-, 114 S.Ct. at 1471-72 (footnotes omitted) (emphasis added). It is worth repeating that the Court specifically recited that the principle of joint and several liability “was in no way abrogated by Reliable Transfer’s proportionate fault approach,” thus treating joint and several liability and proportionate fault as compatible in admiralty. Id. at-, 114 S.Ct. at 1471.
Numerous lower court decisions also recognize that joint and several liability is the maritime rule, even when the case involves a contributorily-negligent plaintiff. See, e.g., Drake Towing Co. v. Meisner Marine Constr. Co., 765 F.2d 1060, 1063, 1067 (11th Cir.1985) (stating, in a maritime tort case involving the Suits in Admiralty Act, that a contributorily-negligent plaintiff “may recover its entire damages, less that proportion attributable to its own fault, from the United States,” even though the United States was only 20% at fault while another defendant was 60% at fault); Gele v. Chevron Oil Co., 574 F.2d 243, 245, 250-51 (5th Cir.1978) (stating, in a general maritime lawsuit, that the plaintiffs own negligence “would not bar recovery of damages” and that the plaintiff has a “right to collect all his damages from one party in the event he is unable to obtain the relative portion of damages from each party at fault”); see also Maritime Comparative Responsibility Act as Referred to House Committee on Judiciary, § 2, H.R. 3318,102d Cong., 1st Sess. (1992) comments, reprinted in 2 Benedict on Admiralty § 7, at 1-35 (7th ed. 1994) (“The existing maritime rule of joint-and-several liability of joint tortfeasors continues to apply under this Act. This is true whether the claimant was eontributorily negligent or not.”); 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 5-5, at 167 (2d ed. 1994) (“The adoption of comparative fault has not affected the well established rule that there is joint and several liability in admiralty tort actions.”); cf. Empire Seafoods, Inc. v. Anderson, 398 F.2d 204, 217 & n. 21 (5th Cir.) (observing that with regard to the divided damages rule for mutual fault, “[t]he authorities state the rule in terms of ‘innocent third parties.’... [W]e are convinced that the reduction of [the con-tributorily-negligent plaintiffs’] respective recoveries under the comparative negligence doctrine is to be considered full penalty for their fault and that they must, thereafter, be treated in the same manner as ‘innocent third parties.’”), cert. denied, 393 U.S. 983, 89 S.Ct. 449, 21 L.Ed.2d 444 (1968).[17]
*1130 In addition, Penrod’s characterization of the contributory negligence bar and joint and several liability as a couplet ignores the important fact that the principles of contribution and indemnity were also developed as a procedural means to counteract the danger that one defendant would be unduly burdened. See Marie R. Yeates et al., Contribution and Indemnity in Maritime Litigation, 30 S.Tex.L.Rev. 215, 217 (1989). Contribution principles distribute a loss “by requiring each tortfeasor to pay that proportion of the damages attributable to his actions.” Id. Indemnity “permits one tortfea-sor to shift all of the loss onto another tort-feasor if it is determined that the latter should rightfully answer for all of the plaintiffs damages.” Id. Both contribution and indemnity provide a mechanism for apportioning the plaintiffs damages among the tortfeasors themselves. See id. This apportionment is designed to alleviate any unfairness resulting from joint and several liability because the tortfeasor paying the entire judgment can recoup some or all of the payments from the other tortfeasors. In short, Penrod’s argument that joint and several liability is reserved only for innocent plaintiffs is plainly inconsistent with the accepted practice of the maritime law.
2. Signals from the states
Admiralty courts have historically been responsive to common-law developments and to legislative enactments. See, e.g., Moragne v. States Marine Lines, 398 U.S. 375, 392, 90 S.Ct. 1772, 1783, 26 L.Ed.2d 339 (1970). In Moragne, for example, the Supreme Court created a general maritime wrongful death cause of action after observing that federal and state law had changed to allow recovery for wrongful death. See id. at 390-93, 401, 90 S.Ct. at 1782-84, 1788.
It is also true that the Supreme Court has been willing to forge a general maritime position when no wholesale consensus has developed. In McDermott, the Court noted that no uniform consensus had developed for an approach to the issue of settlement credits, but the Court went on to evaluate and to choose from the three “principal” alternatives identified by the American Law Institute. See McDermott, — U.S. at- -, 114 S.Ct. at 1465-67. Nevertheless, on more than one occasion, the Supreme Court has counseled against the adoption of a distinctly minority view. See id. at-n. 8, 114 S.Ct. at 1466 n. 8 (“We are unwilling to consider a rule that has yet to be applied in any jurisdiction.”); Miles v. Apex Marine Corp., 498 U.S. 19, 35, 111 S.Ct. 317, 327, 112 L.Ed.2d 275 (1990) (noting the Court’s discomfort with “adopting a distinctly minority view,” and implying that the Court prefers a more “wholesale” and “uniform” policy judgment).
With these principles in mind, an examination of the state law and model law changes to traditional joint and several liability is striking, as the wide variety of alternatives reveals a fragmentation in approaches far greater than the Court was presented with in McDermott. To begin with, approximately *1131 twenty years ago, joint and several liability was the rule in every state. See Pressler & Schieffer, supra, at 656.[18] Since that time, a majority of the states have modified the concept, either by substantial limitation or by outright elimination. See id. at 656-57. Thirteen states, however, still adhere to traditional joint and several liability.
The 1977 Uniform Comparative Fault Act adopted an approach that begins with a joint and several judgment, but permits a defendant to return to the court that entered the judgment to request the court to reallocate a defendant’s equitable share of the judgment — after it is established to be uncollectible — among the remaining tortfeasors and the contributorily-negligent plaintiff:
Upon motion made not later than [one year] after judgment is entered, the court shall determine whether all or part of a party’s equitable share of the obligation is uncollectible from that party, and shall reallocate any uncollectible amount among the other parties, including a claimant at fault, according to their respective percentages of fault.
Uniform Comparative Fault Act § 2(d), 12 U.L.A. 50 (Supp.1993). The Maritime Law Association also adopted this court-ordered reallocation approach in the legislation that it proposed to Congress in 1992.[19] See Maritime Comparative Responsibility Act as Referred to House Committee on Judiciary, § 3(d), H.R. 3318, 102d Cong., 1st Sess. (1992) comments, reprinted in 2 Benedict on Admiralty § 8, at 1-46,1^7 (7th ed. 1994).[20] Four states employ this post-judgment reallocation approach. See Mich.Comp.Laws Ann. § 600.6304; Minn.Stat.Ann. § 604.02; Mo.Ann.Stat. § 537.067; see also Conn.Gen. Stat.Ann. § 52-572h(g) (allowing the reallocation of uncollectible non-economic damages among all parties and uncollectible economic damages among the remaining defendants).
The operation of these reallocation schemes, however, differs in crucial respects from the modified joint liability proposal urged upon us by Penrod. Under the Uniform Comparative Fault Act, for example, traditional joint and several liability is maintained:
The common law rule of joint-and-several liability of joint tortfeasors continues to apply under this Act. This is true whether the claimant was eontributorily negligen[t] or not. The plaintiff can recover the total amount of his judgment against any defendant who is liable.
*1132 Uniform Comparative Fault Act § 2, 12 U.L.A. 50 (Supp.1993) (comment). The Maritime Law Association’s proposed legislation uses similar language:
The existing maritime rule of joint-and-several liability of joint tortfeasors continues to apply under this Act. This is true whether the claimant was contributorily negligent or not. The plaintiff can recover the total amount of his judgment against any defendant who is liable.
Maritime Comparative Responsibility Act as Referred to House Committee on Judiciary, supra, § 7, at 1-35; see also Minn.Stat.Ann. § 604.02(1) (“When two or more persons are jointly liable, contributions to awards shall be in proportion to the percentage of fault attributable to each, except that each is jointly and severally liable for the whole award.”); Mo.Ann.Stat. § 537.067(3) (“This section shall not be construed to expand or restrict the doctrine of joint and several liability except for reallocation as provided in subsection 2.”).
More importantly, even though these schemes reallocate an insolvent defendant’s share of liability, reallocation applies only after a party’s share is determined to be uncollectible. See Uniform Comparative Fault Act § 2(d), 12 U.L.A. 50 (Supp.1993); Maritime Comparative Responsibility Act as Referred to House Committee on Judiciary, supra, § 8, at 1-46, 1-47; Conn.Gen.Stat. Ann. § 52-572h(g); Mich.Comp.Laws Ann. § 600.6304; Minn.Stat.Ann. § 604.02; Mo. Ann.Stat. § 537.067. In contrast, Penrod’s modified joint liability proposal would “reallocate” as part of the initial judgment — before it is determined that a defendant’s share is uncollectible. Thus, Penrod’s proposal builds the risk of noneollection (and the expense and delay of collection) into the judgment, disadvantaging the plaintiff regardless of whether a defendant’s share actually proves to be uncollectible.[21] This is particularly noteworthy in the instant case, where no evidence of insolvency or uncollectibility is present in the record. The rule proposed by Penrod severs the principle of joint and several liability from its collectibility moorings in a manner that no state, uniform law, or even the Maritime Law Association, has embraced.[22]
*1133 As mentioned, aside from the reallocation schemes, there are farther approaches to the modification of joint and several liability. Colorado, Idaho, and North Dakota, for example, have suspended the joint and several liability principle except where the co-defendants were “acting in concert” (or were vicariously liable). See Colo.Rev.Stat.Ann. § 13-21-111.5; Idaho Code § 6-808(5); N.D.Cent. Code § 32-03.2-02.
As a third approach, several states have preserved joint and several liability only when the plaintiff is determined to be wholly without fault. See, e.g., Ga.Code Ann. §§ 51-12-31 to -33; Wash.Rev.Code Ann. § 4.22.070; see also Boyles v. Oklahoma Natural Gas Co., 619 P.2d 613, 616-17 (Okla.1980). A fourth approach limits the application of the traditional rule to situations where the defendant from whom satisfaction is sought bears at least a minimum percentage of the responsibility. See, e.g., Fla.Stat.Ann. § 768.81 (permitting the plaintiff to recover economic damages jointly and severally only from those defendants whose negligence is equal to or exceeds that of the plaintiff); Iowa Code Ann. § 668.4 (allowing joint and several liability only where a defendant’s negligence exceeds 50% of the total responsibility); Mont.Code Ann. § 27-1-703 (same); Tex.Civ.Prac. & Rem.Code Ann. § 33.013 (measuring a defendant’s negligence against total liability for some actions and against the plaintiffs percentage responsibility for others, and permitting joint and several liability only where a defendant’s negligence exceeds the enumerated percentages).
A fifth approach eliminates joint and several liability with respect to non-eeonomic damages, but maintains joint and several liability for economic damages. See, e.g., Cal. Civ.Code § 1431.2; Fla.Stat.Ann. § 768.81; Ohio Rev.Code Ann. § 2315.19; Or.Rev.Stat. § 18.485; cf. Ill.Rev.Stat., ch. 735, para. 5/2-1117 (permitting joint and several liability for medical and medically-related services). Due to public policy concerns, a sixth approach preserves joint and several liability with respect to certain enumerated causes of action. See, e.g., Ariz.Rev.Stat.Ann. § 12-2506(D) (permitting joint and several liability when the cause of action involves hazardous wastes); Nev.Rev.Stat. § 41.141(5) (retaining joint and several liability for strict liability, intentional tort, hazardous substances, and products liability cases); N.M.Stat.Ann. § 41-3A-1 (stating that joint and several liability is available for strict liability claims, intentional torts, and situations “having a sound basis in public policy”). A seventh approach eliminates joint and several liability altogether, instead imposing pure several liability. See, e.g., Alaska Stat. § 09.17.080(d) (“The court shall enter judgment against each party liable on the basis of several liability in accordance with that party’s percentage of fault.”); Utah Code Ann. § 78-27-38(3) (“[N]o defendant is liable to any person seeking recovery for any amount in excess of the proportion of fault attributable to that defendant.”); Wyo.Stat. § l-l-109(e).
Significantly, however, most of the states that modify joint and several liability have adopted a hybrid approach by enacting statutory schemes that incorporate more than one of the above-mentioned trends. See, e.g., Haw.Rev.Stat.Ann. § 663-10.9 (combining limitations relating to causes of action, types of damages, and a defendant’s percentage of responsibility); Ill.Rev.Stat., eh. 735, para. 5/2-1117 (same); Minn.Stat.Ann. § 604.02 (combining claims-related, percentage liability, and reallocation schemes); Wash.Rev. Code Ann. § 4.22.070 (preserving joint and several liability for tortfeasors “acting in concert” and for wholly-innocent plaintiffs). Each scheme represents a unique blend of policy considerations weighed by the respective state legislatures.[23]
*1134 From this examination, we make one important observation: no state has adopted a modified joint liability scheme that functions in the manner proposed by Penrod. It bears repeating that the Supreme Court has been willing to consider positions where no uniform consensus has developed, see McDermott, — U.S. at -, 114 S.Ct. at 1466-67, but the Supreme Court has explicitly stated that it is “unwilling to consider a rule that has yet to be applied in any jurisdiction.” See id. at-n. 8, 114 S.Ct. at 1466 n. 8. We too are unwilling, and we may be unauthorized, to adopt the modified joint liability proposal urged upon us by Penrod.[24]
C. Other Factors Informing Our Ability to Change General Maritime Law
1. Uniformity and “harmonization”
As noted, the general maritime law applies the century-old doctrine of joint and several liability. Similarly, the two principal federal maritime statutes, the LHWCA and the Jones Act, apply joint and several liability principles as well. After recognizing the origins of joint and several liability in the common law and in the general maritime law, the Edmonds Court approved the application of joint and several liability in the context of § 906(b) actions under the LHWCA. See Edmonds, 443 U.S. at 260 & n. 7, 271-73, 99 S.Ct. at 2756 & n. 7, 2762-63.
The doctrine of joint and several liability is crystallized in the Jones Act context as well, although it stems from a different source. By incorporating the remedies afforded to railway employees under the Federal Employers’ Liability Act — with attendant judicial glosses[25] — Congress evidenced its intention that joint and several liability apply in Jones Act cases. See Simeon, 852 F.2d at 1450-51 (King, J., specially concurring); see also Cox v. Roth, 348 U.S. 207, 209, 75 S.Ct. 242, 243-44, 99 L.Ed. 260 (1955) (explaining that in drafting the Jones Act to refer to the FELA, Congress effectively declared that “those contingencies against which Congress has provided to ensure recovery to railroad employees should also be met in the admiralty setting”). Specifically, section 53 of the FELA provides that a plaintiff may recover the total amount of his judgment less that part representing his own contributory negligence. See 45 U.S.C. § 53. There is no exception in the Act for cases in which one or more of the defendants fails to pay its share. Congress, therefore, provided seamen the remedy of joint and several liability that was prevalent at the time that the Jones Act was adopted. See Simeon, 852 F.2d at 1450 (King, J., specially concurring). Indeed, Penrod concedes that Congress has statutorily declared that an injured Jones Act seaman is entitled to be made whole with the benefit of joint and several liability. As Penrod notes:
We do not suggest that the proposed “modified joint liability” apply in any case where Congress has declared that a particular class of litigant, such as the Jones Act seaman or the Longshoremen’s Act employee, is entitled to special consideration.... Statutorily, Congress has declared that injured Jones Act seam[e]n and longshoremen with claims under 33 U.S.C. § 905(b) are to be made whole.... [T]he policy established by Conyress for dealing with injured Jones Act seamen was given controlling weight in the majority opinion in Simeon, as well it should have been....
(emphasis added).
Penrod’s concession is realistic. Numerous cases have recognized joint and several liability for Jones Act violations. See, e.g., Joia v. Jo-Ja Serv. Corp., 817 F.2d 908, 917 (1st Cir.1987) (“The joint and several loss *1135 allocating mechanism which serves to provide an injured seaman his full judgment is consonant with the policy behind the Jones Act_”), cert. denied) 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988); Dicola v. American Steamship Owners Mut. Protection and Indem. Ass’n, Inc. (In re Prudential Lines, Inc.), 170 B.R. 222, 235 (S.D.N.Y.1994) (“[UJnder the Jones Act, ... a tortfea-sor can be held jointly and severally liable for the entirety of the damages a seaman sustains, even if [the tortfeasor’s] negligence was minimal.”); Johnson v. National Steel & Shipbuilding Co., 742 F.Supp. 1062, 1065 (S.D.Cal.1990) (noting that a defendant “can be adjudged jointly and severally liable with the cross-claimants in the cases where plaintiffs or their decedents were seamen pursuant to the Jones Act”); Texaco, Inc. v. Addison, 613 So.2d 1193, 1202 (Miss.1993) (stating that plaintiff “was a Jones Act seaman at the time of his injury and [is] thus entitled to collect damages ... from [defendants], who are jointly and severally liable.") (emphasis added).[26]
Penrod’s proposal would sanction a form of recovery for general maritime law that is different from the form of recovery under the LHWCA and the Jones Act. The present uniformity would be replaced by a lack of uniformity among the legislative and the judicial schemes. Such dissonance has concerned the Supreme Court in many cases. See, e.g., Miles, 498 U.S. at 27, 33, 111 S.Ct. at 322-23, 326 (observing that applicable statutes “both direct and delimit our actions” in shaping the general maritime law, and taking action to “restore a uniform rule applicable to all actions for the wrongful death of a seaman, whether under DOHSA, the Jones Act, or general maritime law ” (emphasis added)); Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 624, 98 S.Ct. 2010, 2014, 56 L.Ed.2d 581 (1978) (noting that “[a]s Moragne itself implied, DOHSA should be the courts’ primary guide as they refíne the nonstatutory death remedy, both because of the interest in uniformity and because Congress’ considered judgment has great force in its own right,” and allowing a coastal waters/high seas distinction in remedies to remain in the general maritime law because “a desire for uniformity cannot override the statute” (emphasis added) (footnote omitted)); Moragne, 398 U.S. at 395, 401, 90 S.Ct. at 1785, 1788 (creating a maritime wrongful death action to remedy “the present nonuniformity in the effectuation of the duty to provide a seaworthy ship” that existed between federal statutory schemes and the general maritime law); see also American Dredging Co. v. Miller, — U.S. -, -, 114 S.Ct. 981, 989, 127 L.Ed.2d 285 (1994) (“While there is an established and continuing tradition of federal common lawmaking in admiralty, that law is to be developed, insofar as possible, to harmonize with the enactments of Congress in the field.” (emphasis added)). We need not decide precisely how far the uniformity principle extends because, given the Supreme Court’s concern with differences between the legislative and judicial maritime law, it would be problematic, to say the least, to accept Penrod’s proposal and thereby create a lack of uniformity among the legislative and judicial schemes in an area where uniformity currently exists.
A different concern, namely, the concern for uniformity within the general maritime law, produces a further complication. Penrod’s change in the general maritime law would directly affect not only Coats-like brown water seamen who are not covered by any federal maritime statute, but *1136 also blue water seamen — the general maritime law’s most common plaintiff. We are therefore compelled to address the “special solicitude” afforded to seamen and their families.[27] See Miles, 498 U.S. at 36, 111 S.Ct. at 327-28; Sea-Land Serv. v. Gaudet, 414 U.S. 573, 583, 94 S.Ct. 806, 814, 39 L.Ed.2d 9 (1974). The law of the sea has developed principles unknown to the common law— specifically, a special solicitude for seamen, as they are considered to be the “wards of admiralty.” See, e.g., O’Donnell v. Great Lakes Dredge and Dock Co., 318 U.S. 36, 40, 63 S.Ct. 488, 490-91, 87 L.Ed. 596 (1943); Garrett v. Moore-McCormack Co., 317 U.S. 239, 246-47, 63 S.Ct. 246, 251-52, 87 L.Ed. 239 (1942) (quoting Harden v. Gordon, 11 F.Cas. 480, 485 (C.C.D.Me.1823) (No. 6047) (Story, J.)). Justice Jackson eloquently described the rationale for affording special concern to seamen:
From ancient times admiralty has given to seamen rights which the common law did not give to landsmen, because the conditions of sea service were different from conditions of any other service, even harbor service- While his lot has been ameliorated, even under modern conditions, the seagoing laborer suffers an entirely different discipline and risk than does the harbor worker. His fate is still tied to that of the ship. His freedom is restricted.
Pope & Talbot, 346 U.S. at 423-24, 74 S.Ct. at 212 (Jackson, J., dissenting).
Traditional joint and several liability offers protection for seamen. One of the realities of a complex and international commercial maritime system is that seamen come into contact with multi-national entities who may be difficult to find, pursue, and collect from in the event of an injury. The ability to recover the judgment from any one defendant, however, as provided by joint and several liability, helps to alleviate this concern. The abolition of joint and several liability for seamen plaintiffs travels against the powerful current of a special protection for seamen. Cf. Edmonds, 443 U.S. at 270, 99 S.Ct. at 2761-62 (stating that although “[s]ome inequity appears inevitable in the present statutory scheme, [] we find nothing to indicate and should not presume that Congress intended to place the burden of inequity on the longshoreman whom the [LHWCA] seeks to protect.”).[28] Preserving joint and several liability for seamen plaintiffs, while modifying joint liability for other general maritime plaintiffs, would introduce a new disuniformity within the general maritime law.
Finally, it would be difficult to cabin Pen-rod’s proposal for the general maritime law in the manner suggested by Penrod — that its proposal would not apply to a LHWCA employee suing under § 905(b). When the Ed-monds Court considered changing maritime law applying joint and several liability in § 905(b) actions, the Court noted that such a change “would effectively alter the [LHWCA] by causing it to reach different results than Congress envisioned.” Ed *1137 monds, 443 U.S. at 271-73, 99 S.Ct. at 2762-63. In short, Penrod’s proposal would affect an “interface of statutory and judge-made law”—that is, a statute (the LHWCA) whose provisions are defined in part by Congress and in part by the common law of admiralty. Id. at 272, 99 S.Ct. at 2762. Given Edmonds, it is no answer that this case does not involve the interface between the LHWCA and the general maritime law because accepting Penrod’s proposal will have some effect on this interface. If the developing case law under the LHWCA does not incorporate a change to modified joint liability, the LHWCA and the general maritime law will be out of step. If the LHWCA does evolve with our change, the LHWCA and the Jones Act will differ in their recovery schemes, as the Jones Act is built upon the FELA—not upon the general maritime law. In either case, the proposed change would engender uncertainty and frustrate the principles of Edmonds. See Edmonds, 443 U.S. at 273, 99 S.Ct. at 2763 (“By now changing what we have already established that Congress understood to be the law, and did not wish itself to modify, we might knock out of kilter this delicate balance. As our cases advise, we should stay our hand in these circumstances.” (footnote omitted)). In short, given our uniformity and harmonization concerns, we are not inclined to adopt Penrod’s modified joint liability proposal for the general maritime law.[29]

9. FH.mva rJ.&MQ') q

Uniformity and predictability are important in admiralty, and Moragne counsels that “[v]ery weighty considerations underlie the principle that courts should not lightly overrule past decisions.” 398 U.S. at 403, 90 S.Ct. at 1789.
In Moragne, the Court enunciated three factors in the stare decisis analysis which must be weighed prior to rejection of a longstanding rule:
[1] the desirability that the law furnish a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; [2] the importance of furthering fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case; and [3] the necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments.
398 U.S. at 403, 90 S.Ct. at 1789. With respect to the first factor, considered to be “the mainstay of stare decisis,” id., we recognize that the need for predictability in the commercial maritime arena is arguably greater than in other areas of law and commerce. This is true because there are already numerous and inherently unpredictable factors stemming from the perils of the sea and the continual—and frequently fortuitous—interaction with enterprises of other nations. It is axiomatic that when the rules of law are clear, parties may contract within or around their boundaries, and the commercial system is facilitated in many ways, including reduced litigation, more favorable insurance coverage, and overall ease of application. This factor therefore counsels against the proposed change. See Lewis v. Timco, 716 F.2d 1425, 1428 (5th Cir.1983) (“The [maritime law’s] values of uniformity, with their companion quality of predictability, a *1138 prized value in the extensive underwriting of marine risks, are best preserved by declining to recognize a new and distinct doctrine without assuring the completeness of its fit.”).
The second factor similarly points away from the proposed change. Our adoption of modified joint liability in this case would promote forum shopping and would add another level of complication to maritime litigation. Modified joint liability would apply only to general maritime law claims, whereas traditional joint and several liability would apply to certain statutory claims.
The final strand of the Moragne inquiry affords an opportunity for changing “a rule unjustified in reason, which produces different results for breaches of duty in situations that cannot be differentiated in policy.” Moragne, 398 U.S. at 405, 90 S.Ct. at 1790. No such situation exists here. The traditional doctrine of joint and several liability, which preserves the right of the injured maritime worker to recover for his injuries, represents a conscious policy choice to shift the burden of uncolleetibility to defendants, and it has substantial justification in history. In addition, the traditional rule currently applies uniformly to statutory and to general maritime law claims — producing the same results for the same breaches of duty often entwined in maritime litigation. In contrast, adopting modified joint liability for general maritime law claims, or only for general maritime law claims of non-seamen, would produce different results than the statutory schemes for the same “tortious” conduct. Thus, the third Moragne factor also counsels against change.
3. Deferral to legislative action
The wide spectrum of legislative enactments across the countiy demonstrates the various policy objectives attainable by altering joint and several liability. Most notable are the distinctions based upon causes of action and types of damages. The Congress is in a better position than a court to evaluate various policy objectives. We are persuaded that deferring to congressional action here is the wiser course. Even here we stand on maritime tradition, for even the earliest jurists appear to have counseled deference to the legislature:
If, within its proper scope, any change is desired in [the] rules [of admiralty], other than those of procedure, it must be made by the legislative department. It cannot be supposed ... that the law should forever remain unalterable. Congress undoubtedly has authority under the commercial power, if no other, to introduce such changes as are likely to be needed.
The Lottawanna, 88 U.S. (21 Wall.) 558, 577, 22 L.Ed. 654 (1874). Congress could evaluate the desirability of modifying joint and several liability not only for the general maritime law, but also for the many maritime statutes that it superintends. Congress could, for example, limit the application of joint and several liability to situations where a defendant bears either a statutory percentage of the total fault or at least more than that of the plaintiff. These precise remedies would be more problematic for a federal court to enact because our instruments of revision are generally blunt. Indeed, as mentioned, the vast majority of the states that have altered traditional joint and several liability have done so legislatively, while only four states have modified the traditional rule through the judicial process. See Joia, 817 F.2d at 917 (“[T]he decision whether to continue this trend [away from joint and several recovery] is more properly before a legislature.”).
We are keenly aware of the fast-moving political forces now calling to heel excesses of the tort law. This turn of the political light upon tort law only stiffens our resolve not to attempt to run in front of the Congress. Leading a political charge is not an appropriate role for a federal court, not even for a federal court sitting in admiralty.
4. Private ordering
Furthermore, contractual allocation of risk by private parties better accomplishes the goal of allocating risk. Private parties, rather than courts, are better able to assess the risks of noncollection and to decide who is in the best position to collect a judgment. Sophisticated maritime parties, intertwined in contractual relationships, can usually foresee the risk of insolvency and can allocate or insure against it. For example, Penrod and *1139 MIS were in a position to address the risk of insolvency when they wrote their contract. Coats had no such “bargaining” position. Indeed, “where potential co-defendants can contract in advance regarding their apportionment obligations among themselves, rules that leave both traditional joint and several liability and traditional apportionment rights in place might create optimal incentives and be consistent with equitable concerns.” 2 American Law Institute, Enterprise Responsibility for Personal Injury 156 (1991). The rules now in place are clear and easily administered. They leave the allocation of the risks of noncollection to the parties best equipped to evaluate these risks. Absent congressional intervention, private ordering of the risks is far superior to the proposed effort. Our ability by definition is inferior to the market’s ability to tailor and allocate these risks.
IV. CONCLUSION
We decline Penrod’s proposal to adopt modified joint liability for the general maritime law. The judgment of the district court is AFFIRMED.

. The district court granted Lee's motion for summary judgment and dismissed it from the case.

. The court also dismissed Coats' claims under the Longshore and Harbor Workers’ Compensation Act because Coats’ injuries did not occur "upon navigable waters of the United States.” 33 U.S.C. § 905(b). As Judge Garwood correctly notes in note 2 of his dissent, the viability of Sieracki seaman status, questioned by Judge De-Moss in his dissent, is not before us.

. Mississippi follows the Restatement (Second) approach which requires application of the law of the place of injury, absent a more significant relationship with another state. Mitchell v. Craft, 211 So.2d 509, 515 (Miss.1968).

.Penrod has not joined MIS in this argument, apparently because Penrod’s claim for contribution or indemnity against MIS is based on general maritime law. If the law of the United Arab Emirates is not applicable, Penrod may prefer to have general maritime law apply rather than Mississippi law.

.After subtracting Coats’ 20% contributory fault, the trial court's judgment was for $740,000 jointly and severally against Penrod and MIS. Under traditional joint and several liability principles, Penrod — equally as responsible as Coats (20% fault) — will be liable for the entire $740,000 judgment.

. We note that no evidence of insolvency or uncollectibility has been presented in this case.

. The formula for calculating the joint liability component and the several liability components can be algebraically expressed. See Simeon, 852 F.2d at 1449 n. 2 (King, J., specially concurring).

. Coats is 20% contributorily negligent. Thus, even though the total damages award is $925,-000, Coats’ maximum recovery is $740,000 (80% of the total damages).

. Note that the sum of the joint liability component and the several liability components should equal the plaintiff's maximum overall recovery. In this case, $416,250 (joint component) + $46,-250 (Penrod’s several component) + $277,500 (MIS’ several component) = $740,000 (Coats’ maximum recovery).
Similarly, the sum of the joint liability component and an individual defendant's several liability component should equal that defendant's maximum liability. For example, $416,250 (joint component) + $46,250 (Penrod's several component) = $462,500 (Penrod’s maximum liability). In the same manner, $416,250 (joint component) + $277,500 (MIS’ several component) = $693,-750 (MIS' maximum liability).

. Penrod’s 20% share of fault is calculated by multiplying Coats' total damages award ($925,-000) by twenty percent.

. MIS’ 60% share of fault is calculated by multiplying Coats’ total damages award ($925,000) by sixty percent.

. Judge Garwood’s position has evolved somewhat over the years since Simeon. In his partial dissent in Simeon, and in his dissent here, Judge Garwood develops his modified joint liability proposal by devising a joint liability component and a several liability component for each defendant. We have always proceeded under the assumption that resort to the joint and several *1124 components is necessary to the operation of his proposal. Likewise, we have always proceeded under the assumption that a plaintiff can only recover the total amount that he is owed by enforcing the judgment against each and every defendant. Indeed, in his dissent, Judge Garwood states that "Apportionment of Liability also notes that the Simeon dissent approach requires 'the plaintiff to pursue enforcement of the judgment against all solvent defendants in order to recover the full amount.'" Judge Garwood does not dispute this assessment, but merely notes that Apportionment of Liability "does not expressly characterize this as undesirable.”
In his present dissent, Judge Garwood tells us, however, that "it will always suffice to simply provide in the judgment a maximum amount which may be collected from each particular defendant,” and he implies that reference to the components, and to the complex formulas that form the basis for calculating these components, is unnecessary.
Judge Garwood's new position, however, is simply incorrect in a situation (common in maritime personal injury cases) where there are more than two defendants. In this situation, if there is no problem of insolvency or uncollectibility, then a judgment specifying only a maximum amount of liability and a proportionate share of fault for each defendant will suffice. If, however, there are more than two defendants, at least two of which are solvent and at least one of which is insolvent (e.g., three defendants, only one of which becomes insolvent), then the plaintiff, because he can only achieve full recovery by collecting each defendant’s several component and one satisfaction of the joint component, will need to know the several liability of each solvent defendant. Furthermore, each solvent defendant will want to know the amount that it is solely liable for, i.e., its several component, so that it does not overpay the plaintiff at this pre-contri-bution stage.
Similarly, if the plaintiff has fully recovered before one of the defendants becomes insolvent (i.e., post-collection, but pre-contribution), the defendant that paid the joint component will want to know the insolvent defendant's several component such that it can be recovered from the overpaid plaintiff. Otherwise the risk of non-collection is disproportionately borne (vastly so) by the defendant that paid the joint component. In summary, there is no way to avoid the computation of the joint and several components of each defendant’s liability, and consequently, there is no way to avoid the complexity of the formulas included in Judge Garwood's dissent.

. Penrod points out that modified joint liability would not alter the ‘'traditional” recovery of a wholly-innocent plaintiff. In situations where a plaintiff is found to be without fault, his proportionate share of fault, by definition, will be 0%. Under modified joint liability, the defendant's proportionate share of fault would be divided by the sum of the plaintiff's 0% and that defendant's proportionate share of fault, yielding that defendant's maximum liability. As Penrod illustrates, assuming a wholly-innocent plaintiff and a defendant who is 20% at fault, the equation is as follows:
0 + 20 = 20
20 divided by 20 = 1 or 100%
Thus, the faultless plaintiff can still recover 100% of its judgment from any of the creditworthy and non-immune defendants.

. In The Max Morris, the Supreme Court also affirmed a lower court's decree for divided damages. See The Max Morris, 137 U.S. at 15, 11 S.Ct. at 33. Significantly, however, the Court noted that the divided damages issue was "the only question certified,” and therefore, the Court's jurisdiction was "limited to reviewing this question.” Id. As the Court concluded:
Whether, in a case like this, the decree should be for exactly one-half of the damages sustained, or might, in the discretion of the court, be for a greater or less proportion of such damages, is a question not presented for our determination upon this record, and we express no opinion upon it.

Id.

. Despite Judge Garwood's reliance in dissent on Petition of Kinsman Transit Co., 338 F.2d 708 (2d Cir.1964), the approach taken in Kinsman Transit is not the approach advocated by Penrod and the dissent. In Kinsman Transit, Kinsman was one of three liable parties, but its liability had been limited by statute. See id. at 713. Thus, at the time of the judgment, Kinsman's share had already been determined to be uncol-lectible, and the Second Circuit reallocated Kinsman’s responsibility proportionately among the other two parties. See id. at 726.
In the instant case, however, no evidence of uncollectibility is present in the record. Nevertheless, the proposal advocated by Penrod and the dissent would still “reallocate” as part of the initial judgment — before it is determined that Penrod's or MIS’ share is uncollectible. Thus, the dissent's proposal builds the risk of noncol-lection into the judgment, disadvantaging the plaintiff regardless of whether a defendant’s share actually proves to be uncollectible. Simply put, although the dissent maintains that Kinsman Transit “is directly on point and should control,” the approach in Kinsman Transit fails to provide direct support for the dissent's proposal. Similarly, the dissent's reliance on the non-admiralty cases of Prestenbach v. Rains, 4 F.3d 358 (5th Cir.1993), and Davis v. Commercial Union Insurance Co., 892 F.2d 378 (5th Cir.1990), is also misplaced, because in those cases, the partially-liable employer was known to be statutorily immune before judgment was entered.
Finally, as will be discussed further, we merely note that Kinsman Transit was decided before a series of Supreme Court admiralty decisions concerning uniformity between the legislative and the judicial maritime law.

. Penrod and Judge Garwood's dissent claim that Edmonds does not preclude the adoption of modified joint liability in this case because Ed-monds was a LHWCA statutory construction case, whereas in the pure maritime context, the federal courts write on a cleaner slate. See McDermott, Inc. v. AmClyde, - U.S. -, -, 114 S.Ct. 1461, 1471, 128 L.Ed.2d 148 (1994) (stating that Edmonds "primarily" involved interpretations of the LHWCA).
Of course, the McDermott Court did not intend to limit the import of Edmonds to LHWCA cases because, as will be explained, it specifically took the time to reconcile Edmonds’ reaffirmation of “the well-established principle of joint and several liability” with the general maritime rule of proportionate settlement credit. See id. at- -, 114 S.Ct. at 1471-72. Moreover, while it is true that Edmonds primarily focuses on the LHWCA and perhaps does not preclude a change in the pure maritime context, the Court clearly refers to joint and several liability, in a situation involving a contributorily-negligent plaintiff, as the rule of the "maritime tort law,” and the Court's message, at a minimum, appears to be that joint and several liability is still the rule in admirally.
More importantly, even if Edmonds is given the contended for narrow construction, the Edmonds Court reaffirmed traditional joint and several liability in the LHWCA context. As will be explained in Part 111(C)(1), when considering an analogous rule for the general maritime law, the Supreme Court has expressed a desire for harmony with statutes such as the LHWCA. Thus, even when given a narrow construction, Ed-monds' embrace of traditional joint and several liability in the LHWCA context counsels us to maintain traditional joint and several liability in the general maritime law.

. We note that substantially all of Judge Garwood’s dissent is directed to supporting the startling proposition that joint and severtil liability is not the existing rule in maritime personal injury cases. The dissent admits that its efforts are directed to making the simple point "that the issue is essentially open,” and it argues that the "longstanding general maritime rule” is that even an innocent plaintiff who is "personally injured in an accident ... recovers judgment initially from each defendant for only half his damages, and can go beyond that as to each only by first showing his (plaintiff’s) inability to collect from the other defendant the latter’s half."
Despite the dissent's heroic efforts to distinguish precedent, its position simply defies reality. The dissent focuses on nineteenth century collision settings rather than maritime personal injury cases, and it is beyond dispute that joint and several liability is the rule in maritime personal injury cases. See Edmonds, 443 U.S. at 259-60, 99 S.Ct. at 2755-56 ("As [admiralty law] had evolved by 1972, a longshoreman's award in a suit against a negligent shipowner would be reduced by that portion of the damages assignable to the longshoreman's own negligence; but, as a matter of maritime tort law, the shipowner would be responsible to the longshoreman in full for the remainder, even if the stevedore’s negligence contributed to the injuries.” (emphasis added)); id. at 271, 99 S.Ct. at 2762 ("Congress did not intend to change the judicially-created rule that the shipowner can be made to pay all the damages not due to the plaintiff's own negli *1130 gence-” (emphasis added)); McDermott, - U.S. at-, 114 S.Ct. at 1471 ("[O]ne can read that opinion [Edmonds] as merely reaffirming the well-established principle of joint and several liability." (emphasis added)); see also Maritime Comparative Responsibility Act as Referred to House Committee on Judiciary, § 2, H.R. 3318, 102d Cong., 1st Sess. (1992) comments, reprinted in 2 Benedict on Admiralty § 7, at 1-35 (7th ed. 1994) ("The existing maritime rule of joint-and-several liability of joint tortfeasors continues to apply under this Act. This is true whether the claimant was contributorily negligent or not.” (emphasis added)); 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 5-5, at 167 (2d ed. 1994) ("The adoption of comparative fault has not affected the well established rule that there is joint and several liability in admiralty tort actions.” (emphasis added)).
Even Penrod acknowledges that joint and several liability is the existing rule of maritime personal injury law. Penrod asks us to change the general maritime law to "replace” joint and several liability with "modified joint liability.” Indeed, it frames its first issue as "[wjhether the doctrine of joint and several liability should be retained in maritime law” (emphasis added). Simply put, as recognized by the Supreme Court, maritime lawyers, commentators in the field, and the appellant itself, the issue is not open: joint and several liability is the rule in maritime personal injury cases.
Thus, Penrod and the dissent ask us to change the existing law of maritime personal injury to adopt a proposal that no jurisdiction has yet to adopt. As we explain, granting such a request is neither authorized nor prudent.

. The Restatement (Second) of Torts incorporates traditional principles of joint and several liability:
Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm.
Restatement (Second) of Torts § 875 (1979). Section 879 further elaborates:
If the tortious conduct of each of two or more persons is a legal cause of harm that cannot be apportioned, each is subject to liability for the entire harm, irrespective of whether their conduct is concurring or consecutive.
Id. § 879. The Restatement (Second) is the latest edition, as the Restatement (Third) on apportionment issues is presently in the initial drafting stage.

. The Maritime Law Association's proposed reform appears to have been spurred by a desire to resolve — in a more satisfactory manner than some courts had done — the settlement of claims among joint tortfeasors issue. As Benedict on Admiralty explains:
Prior to the grant of certiorari in McDermott and Boca Grande Club, it appeared that no uniform rule would develop in the law relating to the settlement of claims among joint tortfea-sors in maritime personal injury claims. Absent a ruling by the Supreme Court, new legislation by Congress appeared the most practical way to settle the law in this area.
The Maritime Law Association of the United States accordingly developed a proposal in an attempt to resolve this complicated issue.... The Bill died with the end of the 1992 term....
Ultimately, either Congress or the Supreme Court will have to address the matter and resolve the conflicting holdings of the district courts. If McDermott and Boca Grande Club do not prove dispositive, when decided, the proposed legislation may be revived.
2 Benedict on Admiralty § 6, at 1-27 (7th ed. 1994) (emphasis added).
Now that McDermott has explicitly resolved the settlement of claims issue by adopting a proportionate share settlement rule, the impetus behind the proposed legislation may have waned.

.Although this bill died in the committee, its proposed operation is relevant to our analysis.

. Judge Garwood's dissent states that Arizona and New Hampshire have also adopted similar reallocation approaches. We note, however, that these states reallocate only after a parly's share is determined to be uncollectible, and, at least in New Hampshire, such reallocation occurs only among defendants. See N.H.Rev.Stat.Ann. § 507:7-E (III) (“Upon motion filed not later than 60 days after final judgment is entered, the court shall determine whether all or part of a defendant’s proportionate share of the obligation is uncollectible from that defendant and shall reallocate any uncollectible amount among the other defendants according to their proportionate shares.” (emphasis added)); cf. Ariz.Rev. Stat. § 12-2508 ("If a contribution share is totally or partially uncollectible, the court shall redetermine the contribution shares of the other tort-feasors...." (emphasis added)).

. It is argued that footnotes thirty-one and thirty-two of the Supreme Court's McDermott opinion cite, with apparent approval, § 2 of the Uniform Comparative Fault Act — specifically, the provision of § 2 relating to "reallocation of [an] insolvent defendant's equitable share." McDermott, - U.S. at-nn. 31 & 32, 114 S.Ct. at 1471 nn. 31 & 32. These references are claimed to indicate the Supreme Court's potential willingness to embrace a rule that places a proportionate share of the risk of one defendant's insolvency upon the contributorily-negligent plaintiff.
These footnote references, however, do not support the adoption of Penrod’s proposal because, under the Uniform Comparative Fault Act, joint and several liability is maintained, and reallocation can only occur on the motion of a party after the initial judgment. Most importantly, however, Judge Garwood’s proposal reaches different substantive results than the Uniform Comparative Fault Act when there are more than two defendants, at least two of which are solvent and at least one of which is insolvent (e.g., three defendants, one of which is insolvent). This is because Judge Garwood’s approach calculates a defendant’s share of liability based on a comparison of the responsibility of that defendant to the combined responsibility of that defendant and the plaintiff, while the Uniform Comparative Fault Act calculates a defendant's reallocated share based on a comparison of the responsibility of that defendant to the combined responsibility of that defendant, the plaintiff, and the remaining solvent defendants.
Because of these critical distinctions, Judge Garwood’s description of his proposal as an “essentially procedural modification to the [Uniform Comparative Fault Act] approach” is a strained description at best. Support for the Uniform Comparative Fault Act cannot be construed as *1133 support for modified joint liability. The differences between them are fundamental.

. There are also differences in how the modifications are accomplished among the states. For example, four states have judicially changed or eliminated joint and several liability. See Brown v. Keill, 224 Kan. 195, 580 P.2d 867, 874 (1978); Prudential Life Ins. Co. v. Moody, 696 S.W.2d 503, 504 (Ky.1985); Laubach v. Morgan, 588 P.2d 1071, 1075 (Okla.1978); McIntyre v. Balentine, 833 S.W.2d 52, 58 (Tenn.1992). But see Boyles v. Oklahoma Natural Gas Co., 619 P.2d 613, 616-17 (Okla.1980) (reaffirming joint and several liability when the plaintiff is wholly innocent). The other state changes to joint and sev *1134 eral liability, however, have been made through the respective legislatures.

. Penrod has urged us only to adopt the previously-described modified joint liability proposal. It has not asked us to consider any other modifications or approaches. In addition, although Judge Garwood's dissent argues that no decision has explicitly considered and rejected modified joint liability, such a widespread lack of consideration, if true, further convinces us that adopting modified joint liability, and creating a wholesale change in the admiralty, is unwise.

. See, e.g., Gaulden v. Burlington Northern, Inc., 232 Kan. 205, 654 P.2d 383, 391 (1982) (“A railroad or other carrier, under FELA, must bear all of the loss sustained by an employee which is caused jointly by the fault of the carrier and third persons.”).

. Judge Garwood's dissent disagrees with our contention that the Jones Act has been applied, in a multi-defendant context, to incorporate traditional joint and several liability principles. Nevertheless, Judge Garwood concedes that in Joia, a 5% contributorily-negligent plaintiff who sued his employer under the Jones Act and a third party under the general maritime law was held to be entitled to judgment against the two defendants, jointly and severally, for the remaining 95% of the plaintiff's damages. Moreover, the dissent concedes that Gaulden stated, in a case involving a contributorily-negligent plaintiff, that the FELA incorporated traditional principles of joint and several liability. Finally, the dissent dispatches as irrelevant three other lower court cases that clearly applied principles of joint and several liability under the Jones Act by claiming that they did not involve a negligent plaintiff. The dissent, of course, is unable to cite any authority to indicate that the Jones Act applies its proposal or some other system of fault distribution and collection.

. The special solicitude for seaman is, of course, the foundation for the Jones Act, perhaps the seaman's most common form of recoveiy when he is injured as a result of the negligence of his employer. See, e.g., Cox, 348 U.S. at 210, 75 S.Ct. at 244 ("The extreme harshness of the old common-law rule abating actions on the death of the tortfeasor flies in the face of the expressed congressional purpose to provide for 'the welfare of seamen.' The Jones Act ‘As welfare legislation ... is entitled to a liberal construction to accomplish its beneficent purposes.’ "). The same solicitude applies under the general maritime law to a seaman who may be unable to establish the predicate for a Jones Act recoveiy, i.e., that his employer was negligent, but is able to establish that his employer's vessel was unseaworthy. Similarly, it applies under the general maritime law when the Jones Act is inapplicable, such as when a seaman is injured through the fault of a third party. See, e.g., Simeon, 852 F.2d at 1423, 1454-55 (King, J., specially concurring) (recognizing the general policy under maritime law to favor and to protect seamen in the context of a seaman's general maritime negligence claim against a third-party tug owner).

. Judge Garwood, in dissent, gives short-shrift to this solicitude for plaintiff seamen, as he repeatedly asserts that the question merely boils down to choosing the “fairest” approach. Our response in Simeon applies equally as well today: "[t]here exists ... no unequivocal measure of what is reasonable, fair, and just. Consequently, a statement that a rule of law is reasonable, fair, or just is simply a reflection that the rule advances a policy that the person judging the rule advocates.” 852 F.2d at 1454 (King, J., specially concurring).

. The McDermott Court reiterated that " 'the Judiciary has traditionally taken the lead in formulating flexible and fair remedies in the law maritime.'” McDermott, - U.S. at-, 114 S.Ct. at 1465 (quoting Reliable Transfer, 421 U.S. at 409, 95 S.Ct. at 1715). It is important to note, however, that the McDermott Court commenced its discussion with the observation that none of the federal admiralty statutes “imposes any limit on our authority to fashion the rules that will best answer the question presented by this case.” In contrast, as we have explained, the federal admiralty statutes and our concerns for uniformity and harmonization do provide some limits on our authority to adopt modified joint liability in this case as a new rule of the general maritime law.
Moreover, the Court’s opinion in Reliable Transfer supports the Supreme Court's "harmonization” concern by acknowledging that "[n]o statutory or judicial precept precludes a change in the rule of divided damages, and indeed a proportional fault rule would simply bring recovery for property damage in maritime collision cases into line with the rule of admiralty law long since established by Congress....” Reliable Transfer, 421 U.S. at 409, 95 S.Ct. at 1715 (citing the Jones Act, 46 U.S.C. § 688) (emphasis added).

. Penrod's appeal from these choice of law decisions by the district court clearly raises the propriety of Coats' status as a "Sieracki seaman” for our determination, even though, as Judge Garwood notes in his dissent, there was no specific objection raised by Penrod to the submission of an issue on unseaworthiness and to the joint submission of negligence and unseaworthiness in the jury issues as to percentages of fault. When a party contests and objects to a trial court's choice of law determination, I can see no need for repetitious and futile objections to the implementation by the trial court of its choice of law determinations during the trial.