Affirmed and Opinion filed February 10, 2011.

 

In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-09-00433-CV



 

Niche Oilfield Services, LLC, Appellant

V.

John Carter, Jr., Appellee

 



On Appeal from the County Court
at Law No. 3

Galveston County, Texas

Trial Court Cause No. 57556



 

OPINION

Niche Oilfield Services, LLC appeals from a judgment
in favor of John Carter, Jr. in connection with a negligence action based on injuries
Carter sustained while cleaning a vessel in navigable waters.  We affirm the
trial court’s judgment.

Background

This appeal arises from an incident that occurred on
March 13, 2006 while Carter was removing residue from a dry bulk tank on the
supply vessel M/V PILOT TIDE in navigable waters.  At the time of the incident,
Carter was working inside the tank using a powerful vacuum hose connected to a three-axle
truck parked on a dock adjacent to the vessel.

The M/V PILOT TIDE was owned and operated by
Tidewater Marine, LLC, which hired Southern Tank Specialists to clean it. 
Southern Tank employed Carter as part of its five-man cleaning crew.  Southern
Tank hired Niche to provide a vacuum truck called a “Gap-Vac” for use in
cleaning the vessel.  Niche employed the Gap-Vac’s driver and operator, Jerry
Dickens.

The dry bulk tank was approximately 12 feet deep and
was situated below the vessel’s main deck.  It was fitted with a
floor-to-ceiling internal ladder accessible by a 24-inch manhole on the deck.

Dickens parked the Gap-Vac on the dock about 25 to 50
feet away from the vessel with the back of the truck facing the vessel.  A
vacuum hose ran from the back of the truck up and over the vessel’s side rail,
across the deck, and through the manhole down into the tank where Carter was
working.  Dickens operated the Gap-Vac from a control panel located next to a
shut-off valve on the back of the truck.

Loud noise generated by the Gap-Vac precluded verbal
communication with Dickens and necessitated hand signals.  From his lower position
on the dock, Dickens could not see over the rail to observe the tank or the manhole;
accordingly, two Southern Tank employees were positioned to relay hand signals
to Dickens.  One Southern Tank employee was designated as the “hole watch” stationed
next to the manhole.  A second Southern Tank employee, Jamie Andrews, was designated
as the “rail watch” stationed at the vessel’s side where Dickens could see him
from the dock.  

The incident occurred after rain began falling during
the cleaning operation.  To prevent rain from entering the tank where Carter
was working, a tarp was draped over three five-gallon buckets placed around the
manhole.  The tarp was sucked into the manhole while Carter was using the Gap-Vac’s
vacuum hose at the bottom of the tank; the tarp cut off Carter’s air supply as
the vacuum simultaneously sucked oxygen from the tank.

Carter became aware of the problem when he began
having difficulty breathing and his ears started to pop.  After looking up and
seeing that the tarp had been sucked into the manhole, Carter climbed up the
ladder and attempted without success to break the seal by pushing on the tarp. 
He climbed down, climbed back up, and tried without success to cut a hole in
the tarp.  Carter climbed back down the ladder to the bottom of the tank and
then passed out while attempting to climb up the ladder a third time.  He
regained consciousness while lying at the bottom of the tank.  By that time the
suction had been released and the Southern Tank crew was removing the tarp. 
Carter subsequently underwent surgery and received other medical treatment for injuries
he attributed to falling from the ladder inside the tank.

Carter sued Tidewater and Niche in July 2007,
asserting that they acted negligently and that the vessel was unseaworthy.  In
his first amended petition, Carter asserted that “[t]his claim is maintained
under the common law of Texas and/or the general maritime law of the United
States.”  Carter settled his claims against Tidewater before trial.

At trial, Carter contended that Niche acted
negligently and proximately caused his injuries because (1) the Gap-Vac lacked
a remote shutoff and a vacuum breaker; (2) Niche failed to train Dickens
adequately; and (3) Dickens left his post at the back of the truck while Carter
was working in the tank, which meant that Dickens was not in position to
receive a signal from the rail watch and shut off the Gap-Vac immediately when
trouble arose.

Evidence regarding Dickens’s whereabouts during the
incident was disputed at trial.  Dickens testified that he was standing at the
back of the truck near the vacuum shut-off while Carter was working in the
tank.  He testified that no one signaled to him on the day of the incident or
otherwise informed him that there was a problem.  Other testimony indicated
that Dickens was not standing by the controls at the back of the Gap-Vac while
Carter was working in the tank; therefore, he was unable to see or act on the rail
watch’s shut-off signal when the tarp was sucked into the manhole.  In this
version of events, Dickens’s absence from his post prolonged the emergency until
Lawson Midkiff, a Southern Tank supervisor, released the suction by cutting the
vacuum hose with a knife.

In Question No. 1, the jury was asked whether Carter’s
injury was proximately caused by the negligence of Carter, Niche, Tidewater,
and/or Southern Tank.  The jury answered “no” as to Carter and “yes” as to the
other entities.  In answer to Question No. 2, the jury attributed 80 percent of
the injury-causing negligence to Niche, 15 percent to Southern Tank, and the
remainder to Tidewater.  The jury awarded $810,000 in damages encompassing awards
for past and future medical care, pain and mental anguish, lost earning
capacity, and physical impairment.

The trial court signed a final judgment on February
27, 2009, in which it concluded that (1) Carter’s claims are governed by
general maritime law; (2) Niche is jointly and severally liable under general
maritime law; and (3) Niche is entitled to a five percent reduction in the
damage award under general maritime law based on the pretrial settlement and the
jury’s apportionment of liability to Tidewater.

In conformity with these conclusions, the trial
court’s final judgment awards damages of $769,500 in favor of Carter and
against Niche, along with costs of court.  Niche timely appealed.

Analysis

Niche raises four issues on appeal.  First, it
contends that the only evidence proffered to establish Dickens’s absence from
his post is inadmissible hearsay; therefore, Niche argues that the evidence is
legally and factually insufficient to support the jury’s “yes” answer as to
Niche in Question No. 1 and its apportionment of responsibility to Niche in
Question No. 2.  Second, Niche contends that Carter’s alternative negligence
theories cannot support the jury’s answers or the trial court’s judgment. 
Third, Niche contends that a new trial is warranted based on the cumulative
effect of the erroneous admission of hearsay statements.  Fourth, Niche contends
that the trial court erroneously computed the settlement credit to which Niche
is entitled by applying maritime law instead of Texas law.

I.                  
Standard and Scope of Review

A.   
Legal and Factual Sufficiency of
the Evidence

Legal insufficiency
challenges may be sustained only when the record discloses one of the following
situations: (a) a complete absence of evidence of a vital fact; (b) the court
is barred by rules of law or of evidence from giving weight to the only
evidence offered to prove a vital fact; (c) the evidence offered to prove a
vital fact is no more than a mere scintilla; or (d) the evidence establishes
conclusively the opposite of the vital fact.  City of Keller v. Wilson,
168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W. Calvert, “No Evidence” and
“Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361, 362-63 (1960)).

We must consider evidence
in the light most favorable to the verdict and indulge every reasonable
inference that would support it.  Id. at 822.  If the evidence allows
only one inference, neither jurors nor the reviewing court may disregard that
evidence.  Id.  “The traditional scope of review does not disregard
contrary evidence in every no evidence review if there is no favorable evidence
(situation (a) above), or if contrary evidence renders supporting evidence
incompetent (situation (b) above) or conclusively establishes the opposite
(situation (d) above).”  Id. at 810-11.  If the evidence at trial would
enable reasonable and fair-minded people to differ in their conclusions, then
jurors must be allowed to do so.  Id. at 822.  Accordingly, the ultimate
test for legal sufficiency always must focus on whether the evidence would
enable reasonable and fair-minded jurors to reach the verdict under review.  Id.
at 827.  Legal sufficiency review in the proper light must credit favorable
evidence if reasonable jurors could do so, and must disregard contrary evidence
unless reasonable jurors could not do so.  Id.  The reviewing court
cannot substitute its judgment for that of the trier of fact if the evidence
falls within this zone of reasonable disagreement.  Id. at 822.

In reviewing factual
sufficiency, we must consider and weigh all the evidence. Golden Eagle
Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003).  We can set
aside a verdict only if the evidence is so weak or if the finding is so against
the great weight and preponderance of the evidence that it is clearly wrong and
manifestly unjust. Id.

B.     Admission
of Evidence

A trial court’s admission or exclusion of evidence is
reviewed for abuse of discretion.  See, e.g., In re J.P.B., 180
S.W.3d 570, 575 (Tex. 2005).  Reversal based on the erroneous admission of
evidence is warranted only if a review of the entire record demonstrates that
the error probably caused the rendition of an improper judgment.  Nissan
Motor Co. v. Armstrong, 145 S.W.3d 131, 144 (Tex. 2004); see Tex. R.
App. P. 44.1.

II.              
Sufficiency and Admissibility of Evidence Pertaining to
Negligence

We begin with Niche’s first issue challenging the sufficiency
of the evidence to support the jury’s negligence finding and its apportionment of
comparative responsibility.  We also address Niche’s third issue asserting that
a new trial is warranted based upon cumulative errors arising from the trial
court’s admission of hearsay testimony concerning Dickens’s whereabouts during
the incident.  Niche’s arguments on appeal warrant a detailed discussion of the
evidence adduced at trial.

Carter predicated his negligence claim against Niche
in significant part on a contention that Dickens left his post at the back of
the Gap-Vac near the controls while Carter was using the vacuum to remove debris
in the dry bulk tank.  According to Carter’s theory of the case, this departure
violated the applicable standard of care and proximately caused his injuries
because Dickens was not standing by the controls to receive a signal and immediately
shut the vacuum off when trouble arose in the tank.  

For his part, Dickens testified at trial that he was
standing at the back of the truck near the vacuum shut-off so that he could see
Jamie Andrews, the rail watch, while Carter was working in the tank.  Dickens
testified that no one signaled to him on the day of the incident or otherwise
informed him that there was a problem while Carter was working in the tank.  Dickens
denied leaving his post and denied going to the truck cab.  Dickens also denied
receiving any complaints after the incident about having left his post.  He
testified that he was unaware of any problem in the tank when he left the job
site on March 13.  Andrews, the rail watch, did not testify.

Carter testified without objection on direct
examination as follows:

Q.        As they’re pulling [the tarp] . . . off, they’re
helping you get out of the tank?

A.        Yes, sir.

Q.        Who was up there?

A.        Lawson Midkiff, Jamie Andrews, and Juan and
Rydell Palmer.

Q.        What was Mr. Midkiff doing?

A.        He was hollering and
cussing.  And he was fussing about he couldn’t believe that Gap-Vac driver
wasn’t at his post.

Niche elicited similar testimony
from Carter during cross-examination.  Carter answered “Yes, ma’am” to a
question during cross-examination asking, “Did you ever talk to anybody that
didn’t see [Dickens] . . . at his post?”  In response to a follow-up question
asking “Who is that?” Carter answered:  “Lawson Midkiff.”  Niche emphasizes
that Carter could not see what was happening on deck or on the dock because he
was working inside the tank when the incident occurred.

Wayne LaSalle, who is Carter’s older brother and fellow
Southern Tank employee, also testified without objection regarding Dickens’s
whereabouts:

A.        From what they told
me the Gap-Vac hose sucked the tarp down, and they couldn’t locate the Gap-Vac
driver to knock it out of gear.

*                                  *                                  *

Q.        Now, who is it — when you get a contractor to
bring a Gap-Vac truck out, who is it that’s actually running the Gap-Vac truck?

A.        The Gap-Vac driver.

Q.        And in the experience you’ve had, what does the
Gap-Vac truck driver — what does he do?  What is he responsible for?

A.        He’s responsible to stay at the back of the truck
and operate it at all times.

Q.        And you said at least in your part in filling out
the accident report in this case, it’s your understanding that the Gap-Vac
truck driver didn’t stay in place?

A.        That’s correct.

Niche stresses that Wayne
LaSalle lacked personal knowledge because he was not on the vessel when the
incident occurred and learned about it afterwards.

Relying on Kerlin v. Arias, 274 S.W.3d 666,
668 (Tex. 2008), Niche argues that this hearsay-based testimony from Carter and
Wayne LaSalle lacks probative value.  Niche misplaces its reliance on Kerlin.

The summary judgment movant in Kerlin objected
on hearsay grounds to an affidavit proffered by the non-movant; the Texas
Supreme Court agreed that statements in the affidavit relying on out-of-court
sources were “hearsay and carrie[d] no probative weight over Kerlin’s
objection.”  Id. at 667-68.  Here, Niche did not object to the testimony
set forth above.  Unobjected-to hearsay properly may be considered in analyzing
the sufficiency of the evidence supporting a jury verdict.  See City of
Keller, 168 S.W.3d at 812 n.29; In re E.A.K., 192 S.W.3d 133, 151
(Tex. App — Houston [14th Dist.] 2006, pet. denied); see also Tex. R.
Evid. 802.  Therefore, we consider this testimony from Carter and Wayne LaSalle
in conjunction with Niche’s sufficiency challenges.

In addition to the testimony set forth above, Southern
Tank’s regional manager Marvin LaSalle also discussed Dickens’s whereabouts
while Carter was working in the vessel’s dry bulk tank.  Marvin LaSalle was not
present on the vessel when the incident occurred; he helped Carter fill out an
accident report afterwards.  Marvin LaSalle testified as follows on direct
examination:

Q.        Tell us generally what was your understanding of
what had happened?

A.        The weather had got bad, and they told –

[NICHE’S COUNSEL]:       That’s hearsay.  He wasn’t here to
see what happened and to hear what happened.  There’s plenty of witnesses to
testify what happened.

[CARTER’S COUNSEL]:    I’m not offering this for the truth
of the matter asserted.  I want to get some context.  He was part of filling
out an accident report on this.  I’m not offering this for the truth of the
matter asserted.

THE COURT:            Overrule the objection.

No running objection to
hearsay was requested.  Marvin LaSalle then described his understanding that
(1) a tarp had been placed over the hole “to keep the weather out,” but it was
“sucked down into the hole;” and (2) “by the time they got the suction off the hose
and stuff, the damage had been done.”  He also testified that “no direct rule
or regulation” governs the height at which a tarp must be placed.  This portion
of Marvin LaSalle’s testimony did not discuss whether Dickens was present at
his post while Carter was working in the vessel’s dry bulk tank.

Marvin LaSalle’s testimony continued as follows:

Q.        After you got this report from Mr. Midkiff about
what had happened, what did you do next?

A.        I wasn’t available to go to the job, so the next,
I think, it was a couple of days before I could get to them.  And I invited
them over to my residence where my little portable office was.  And we did a
report of what happened.

Q.        Did you assist with filling out that report?

A.        Yes.

Q.        Who all was present when the report was filled
out?

A.        Wayne LaSalle, John Carter, Alfred Harrison,
Lawson Midkiff.  And I can’t remember Rydell’s last name, but we called him
“Ski Boy.”  I don’t have any record of that.

Q.        And what information — tell us:  What was
ultimately reported in the accident report?

A.        The accident report would cover — 

[NICHE’S COUNSEL:]  Objection, I object.  If there’s an
accident report, we need to see the accident report rather than what was
reportedly in it.

[CARTER’S COUNSEL:]  Your honor, the issues that we have
here, the Southern Tank records have been subpoenaed.  The form was not
included with what was actually produced by Southern Tank.  There are several
people who are going to testify that they were there.  As far as filling out
this report, this is the only evidence we have of it.  We don’t have the actual
documents.

THE COURT:  Overrule the objection.

Q.        . . . Mr. LaSalle, if you would, would you tell
us, as best as you can recall, what was included in the document that y’all
completed.

A.        It starts off with the setup, and it starts —
then it becomes your witness.  Each witness makes a statement of what, you
know, they actually saw on the job.  And it would, in turn, entitles everyone
whether they were at their positions at the time of the accident, what took so
long for the power of the truck to be cut off to prolong whatever incident
happened at the accident.

Q.        Okay.  There are two issues you mentioned
specifically that I want to ask you about.  One of those is whether everybody
was in place as they should have been.  Can you tell us, based on your memory,
what was actually reported in the accident report?

A.        You’re testing my
memory.  The accident report basically stated that the hole watch relayed to
the rail watchman to relay to the truck to cut his power off.  And the truck
driver was not at his controls, and they couldn’t reach him until someone ran
off the boat to go and get him and found him in the cab of the truck.  And the
supervisor on the job — which he wasn’t supposed to have — reached in his
pocket and got a knife and I think as a last resort — cut the hoses to cut the
power off, cut the suction off.

Niche attacks the last answer
as “hearsay within hearsay.”  But Niche did not object to the last answer on
that basis at trial, and it did not request a running objection to hearsay
contained in the accident report.

At most, Niche lodged what reasonably could be
construed as an objection under Texas Rule of Evidence 1002 during this portion
of Marvin LaSalle’s testimony discussing the accident report and Dickens’s
whereabouts.  Niche does not challenge the admissibility of this testimony under
Rule 1002 on appeal.

Additionally, Niche elicited similar testimony from
Marvin LaSalle on cross-examination:

Q.        So they first recognized that there was a problem
with the tarp and it took 20 to 30 minutes before they cut the suction off?

A.        Before they could get it cut off.  They went
through their line of training, which was the hole watch to wall monitor to the
truck driver.  The truck driver, everybody was in position but him.  So
somebody ran to try to get ahold of him.  And they found him inside the truck. 
By that time the supervisor decided to pull his knife out and cut the hose.

We consider the unobjected-to
hearsay and hearsay elicited via cross-examination of Marvin LaSalle in
assessing Niche’s sufficiency challenge.  See Tex. R. Evid. 802; City
of Keller, 168 S.W.3d at 812 n.29; In re E.A.K., 192 S.W.3d at 151.

Expert testimony also addressed Dickens’s location
during the incident.  Carter’s expert safety engineer Jack Madeley testified on
direct as follows:

A.        . . . Meanwhile on the top[,] the hole watch, the
rail watch, Mr. Midkiff see what’s happening; and they immediately try and go
to pull the vacuum or pull the tarp, meanwhile signaling for the operator to
shut the truck down.  Well, he’s not there.  The operator is nowhere to be
seen.  And they’re yelling and screaming for the operator to shut it off.  He
can’t hear them, so they’re still trying to get the tarp off. . . .

*                                  *                                  *

Q.        Okay.  And, sir, based on all the information
that you reviewed, is there anything to indicate to you that, in fact, that
this driver was in proper position?

A.        There’s testimony of and there’s a number of
statements from some of the witnesses that he was not at the back of the
truck.  They did not see where he was.  Apparently he was in the cab of the
truck, not paying attention because they had been signaling; and he was not
responding to their signaling at all.

During cross-examination by
Niche, Madeley testified as follows:

Q.        Are you telling this Court that you believe that
the Niche employee who was 200 feet or 200 yards away from the hole had more
responsibility for the safety of Mr. Carter [than] he had for himself or that
Southern Tank had for him?

A.        Not more responsible for the safety of; but I
think with respect to the causation of the accident, is substantially more
involved in the causation because Southern Tank had undertaken precautions. 
They had the hole watch.  They had people standing there.  They had people
there ready to rescue.  And the only person that disappeared, that we have
testimony disappeared from his job, was the Niche employee.

Madeley returned to the issue
of Dickens’s whereabouts during redirect:

Q.        With some of the questions Opposing Counsel asked
you, you were using the term “responsible for a safe work environment” and I
think eventually you started to use the term “responsible.”  Sir, it would be
true in this case that everyone involved, all the companies, Southern Tank,
Tidewater, Niche, those companies would all have responsibility for providing a
safe work environment; is that right.

A.        Sure.

Q.        Now, how is that different than actually having
some causal responsibility [for what] happened to Mr. Carter?

A.        Well, there you take a look at what the events
were, either things that happened or did not happen that ended up causing the
particular events; and in this case when the tarp got sucked down, you had a
missing operator that could not shut the thing off.

Q.        And, sir, we’ve talked about everyone having
responsibility for a safe work environment; but with regard to the accident, in
your opinion who has overwhelming responsibility for the accident that happened
to Mr. Carter?

A.        That would be Niche because it’s their operator
who disappeared from his post.

*                                  *                                  *

Q.        And sir, you’ve reviewed the testimony of Mr.
Carter.  You’ve reviewed statements from every member of the Southern Tank crew
that was present there.  Based on that information that you reviewed, is it clear
to you that the driver from the Niche truck actually left his post?

A.        Yes.

Niche does not contend on
appeal that Madeley’s expert testimony is inadmissible.  Instead, Niche
contends that Madeley’s testimony regarding Dickens’s whereabouts is conclusory,
speculative, and “not evidence of what actually happened” because his knowledge
and opinions were based on hearsay statements from Southern Tank employees “who
did not personally see whether Dickens was or was not where he said he was.”

Niche acknowledges that an expert can testify at
trial in appropriate circumstances about hearsay evidence relied upon in
forming an expert opinion if such evidence reasonably would be relied upon by
experts in the field in forming opinions or inferences regarding the subject at
issue.  See, e.g., Sosa by and through Grant v. Koshy, 961 S.W.2d
420, 426-27 (Tex. App.—Houston [1st Dist.] 1997, pet. denied) (citing Tex. R.
Evid. 703, 705).[1] 
Niche nonetheless argues that Madeley’s recounting of the hearsay he relied
upon concerning Dickens’s whereabouts merits no weight in analyzing the
sufficiency of the evidence to support the jury’s answers to specific questions
in the charge.

Niche’s safety expert, Joseph Kocurek, also testified
about hearsay statements regarding Dickens’s whereabouts made by Andrews, the
rail watch, and Midkiff, the supervisor.  Kocurek did so when he complied with
a request by Carter’s counsel to read along with the text of unsworn recorded
statements by Andrews and Midkiff.  Carter’s counsel did not offer the unsworn recorded
statements into evidence, and he expressly disclaimed any intent to offer these
statements for the truth of the matters asserted therein.  The trial court
overruled Niche’s objections that the statements were inadmissible hearsay, and
that it was improper to present these inadmissible hearsay statements to the
jury in this manner.

In the course of these “read-alongs,” Kocurek
recounted statements by Andrews and Midkiff to the effect that Dickens was not
present at his position at the Gap-Vac’s controls when the incident occurred. 
On appeal, Niche contends that the hearsay statements from Andrews and Midkiff recounted
in Kocurek’s “read-alongs” carry no weight for sufficiency purposes because
Carter’s counsel specifically disclaimed any intent to proffer this evidence
for the truth of the matter asserted therein concerning Dickens’s whereabouts.

We now turn to the specific challenges presented in
Niche’s first and third issues on appeal.

We reject Niche’s contention in its first issue that
legally insufficient evidence supports the jury’s “yes” answer as to Niche’s
negligence in response to Question 1 and its apportionment of comparative
responsibility in response to Question 2.  Hearsay evidence tending to
establish that Dickens left his post was admitted repeatedly without objection
during the testimony of Carter, Wayne LaSalle, and Marvin LaSalle.  Niche also
elicited testimony to this effect during its cross-examination of Carter and
Marvin LaSalle.  This evidence amounts to much more than a scintilla; this case
does not involve a complete absence of evidence that
Dickens left his post.  Furthermore, as discussed above, this court is not
barred by rules of evidence from considering unobjected-to hearsay evidence
offered via Carter, Wayne LaSalle, and Marvin LaSalle to establish that Dickens
left his post.  See City of Keller, 168 S.W.3d at 810, 812 n.29; see
also Tex. R. Evid. 802 (“Inadmissible hearsay admitted without objection
shall not be denied probative value merely because it is hearsay.”).

Dickens testified that he
did not leave his post, but his testimony does not conclusively establish this
fact. The jury was entitled to weigh Dickens’s testimony that he remained near
the Gap-Vac controls against testimony from Carter, Wayne LaSalle, and Marvin
LaSalle indicating that Dickens left his post.  In so doing, reasonable and
fair-minded jurors could answer “yes” as to Niche in response to Question 1 and
apportion 80 percent of the injury-causing negligence to Niche in response to
Question 2 based upon evidence that Dickens was (1) absent from his post at the
Gap-Vac controls when the incident occurred, and thus (2) unable to receive
signals and shut off the vacuum immediately when signaled to do so after the
tarp was sucked into the manhole.  See id. at 822, 827.  Therefore, we
conclude that these answers are supported by legally sufficient evidence.  We
likewise reject Niche’s contention that this evidence is so weak and the
answers to Question No. 1 and Question No. 2 are so against the great weight
and preponderance of the evidence as to make the jury’s verdict clearly wrong
and manifestly unjust.  Golden Eagle Archery, Inc. 116 S.W.3d at 761.

Because testimony from Carter, Wayne LaSalle, and
Marvin LaSalle constitutes legally and factually sufficient evidence to support
the jury’s answers to Question No. 1 and Question No. 2, we do not address
whether additional hearsay testimony from safety experts Madeley and Kocurek
concerning Dickens’s absence from his post — proffered in the format of “read
alongs” or otherwise — should be given weight for purposes of a sufficiency
review.  We also do not address Niche’s second issue on appeal, which focuses
on whether the jury’s verdict can be affirmed based on alternative theories of
negligence distinct from Carter’s contention that Dickens was absent from his
post during the incident.

Based on the testimony discussed at length above from
Carter, Wayne LaSalle, and Marvin LaSalle, we reject Niche’s third issue and
its argument predicated on cumulative error from the admission of hearsay
evidence.  The trial court’s admission of unobjected-to hearsay from Carter,
Wayne LaSalle, and Marvin LaSalle concerning Dickens’s whereabouts was not
erroneous.  Niche does not challenge the admissibility of Madeley’s expert
testimony referencing Dickens’s whereabouts.  Assuming for argument’s sake that
the “read alongs” with Kocurek were error, any inadmissible hearsay introduced
in the course of those “read alongs” was cumulative of other evidence regarding
Dickens’s whereabouts that was introduced elsewhere during trial. 
Additionally, we note that Carter’s counsel did not expressly refer to Kocurek
during closing and did not emphasize the “read-alongs” during closing.  Niche
cannot establish harmful error on this record.  See, e.g., GTE Sw., Inc. v.
Bruce, 998 S.W.2d 605, 620 (Tex. 1999) (erroneous admission of expert
testimony was harmless error because testimony was cumulative of other
testimony); see also Tex. R. App. P. 44.1; Air Prods. & Chem.,
Inc. v. Odfjell Seachem A/S, 305 S.W.3d 87, 96-99 (Tex. App.—Houston [1st Dist.]
2009, no pet.).

We overrule Niche’s first, second, and third issues.

III.           
Application of Maritime Law

Niche’s last issue presents a legal question
regarding the applicability of general maritime law.

The trial court denied Niche’s request to apply a
dollar-for-dollar credit under Texas law based on Tidewater’s pre-trial
settlement.  See  Tex. Civ. Prac. & Rem. Code Ann. § 33.012(b)
(Vernon 2008).  Instead, the trial court applied general maritime law and reduced
the jury’s damage award against Niche by five percent based on the jury’s
apportionment of liability to Tidewater.  See McDermott, Inc. v. AmCLYDE,
511 U.S. 202, 217-21 (1994).  Niche contends that the trial court erred by
applying general maritime law and refusing to apply a dollar-for-dollar credit
under Texas law.

Article III, Section 2 of the United States
Constitution confers subject matter jurisdiction over admiralty and maritime causes of action upon federal courts.  U.S. Const.
art. III, § 2, cl. 1.  Congress likewise has conferred “original jurisdiction .
. . of . . . any civil case of admiralty or maritime jurisdiction” upon federal
district courts.  28 U.S.C. § 1333(1).  Under section 1333(1)’s “saving to
suitors” clause, state courts also can entertain in personam maritime
causes of action.  Texaco Ref. & Mktg., Inc. v. Estate of Dau Van Tran,
808 S.W.2d 61, 64 (Tex. 1991) (citing 28 U.S.C. § 1333(1)).  When they do so,
the “‘substantive remedies afforded by States [must] conform to governing
federal maritime standards.’”  Id. (quoting
Offshore Logistics, Inc. v. Tallentire,
477 U.S. 207, 223 (1986)).  If an action is capable of being heard and
determined in admiralty, then federal general maritime law applies regardless
of whether the action is brought in federal or state court.  Seven Seas Fish
Mkt., Inc. v. Koch Gathering Sys., Inc., 36 S.W.3d 683, 686 (Tex. App.—Corpus
Christi 2001, pet. denied).

Courts apply a
two-prong test to determine whether a tort claim falls within admiralty
jurisdiction and thus is governed by general maritime law.  One prong focuses
on location; the other focuses on connection to maritime activity.  Jerome
B. Grubart, Inc. v. Great Lakes Dredge & Dock, Co., 513 U.S 527, 534
(1995); see also Executive Jet Aviation, Inc. v. City of Cleveland, 409
U.S. 249, 268 (1972); Marine Transp. Corp. v. Methodist Hosp., 221
S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2006, no pet.); Seven Seas
Fish Mkt., Inc., 36 S.W.3d at 686.

Under the location
prong, a court must determine whether a tort occurred on navigable waters or
whether an injury suffered on land was caused by a vessel on navigable waters. 
Grubart, 513 U.S. at 534; Marine Transp. Corp., 221 S.W.3d at
145; Seven Seas Fish Mkt., Inc., 36 S.W.3d at 686.

The maritime nexus
prong involves two inquiries.  Grubart, 513 U.S. at 534.  First, a court
must assess whether the general features of the incident have a potentially
disruptive impact on maritime commerce.  Id.  This
inquiry evaluates potential disruption rather than actual disruption.  Sisson
v. Ruby, 497 U.S. 358, 363 (1990).  Second, a court must assess whether the
general character of the activity giving rise to the incident shows a
substantial relationship to traditional maritime activity.  Grubart, 513
U.S. at 534; see also Sisson, 497 U.S. at 364-65.  The key to
this latter inquiry is “whether a tortfeasor’s activity, commercial or
noncommercial, on navigable waters is so closely related to activity
traditionally subject to admiralty law that the reasons for applying special
admiralty rules would apply in the suit at hand.”  Grubart,
513 U.S. at 539-40.

A.    Waiver

As a threshold matter, we reject Niche’s contention
that Carter waived application of maritime law because he “did not sufficiently
invoke maritime law with respect to his claims against Niche . . . .”

Carter pleaded as follows in Plaintiff’s First
Amended Petition:  “This claim is maintained under the common law of Texas
and/or the general maritime law of the United States.”  The Clerk’s Record
provides no indication that Niche challenged the adequacy or specificity of
this allegation via special exceptions.  Carter’s counsel stated as follows at
the beginning of the charge conference:  “[W]e have pled under both the Texas
common law and under general maritime law.  We maintain that the case would be
governed by maritime law even though the Defendant in this case was onshore.”  Carter’s
counsel reiterated his position that general maritime law applied in the course
of discussing proper formulation of the jury charge.

This record demonstrates that Carter sufficiently
invoked maritime law in the trial court.

B.     Maritime
Location

The maritime location prong is satisfied here because
the tort at issue occurred on navigable waters.  A
tort occurs for these purposes where the negligence takes effect — not where
the negligent acts or omissions are committed.  Exec. Jet, 409 U.S. at
266 (citing The Plymouth, 3 Wall. 20, 35, 36 (1866), and Smith &
Son v. Taylor, 276 U.S. 179 (1928)).  Niche’s dockside negligence in
operating the Gap-Vac took effect on navigable waters because that
negligence proximately caused Carter’s injuries while he was working on the M/V
PILOT TIDE in navigable waters.  See Marine Transp. Corp., 221 S.W.3d at
145 (“‘Thus, where a force giving rise to an injury on the waters originates on
land, the tort is maritime.’”) (quoting Hails v. Atl. Richfield Co., 595
F. Supp. 948, 950 (W.D. La. 1984)).

C.    Substantial
Connection

1.      Potential
disruption

We turn next to the potential disruption inquiry,
which involves an assessment of “‘the general features of the type of incident
involved’ . . . to determine whether the incident has ‘a potentially disruptive
impact on maritime commerce.’”  Grubart, 513 U.S. at 534 (quoting Sisson,
497 U.S. at 363 & 364 n.2).  Here, the “general features of the type of
incident” encompass an injury to a worker while maintaining a vessel in
navigable waters.  “Without a doubt, worker injuries, particularly those
involved in repair and maintenance, can have a disruptive impact on maritime
commerce by stalling or delaying the primary activity of the vessel.”  Coats
v. Penrod Drilling Corp., 61 F.3d 1113, 1119 (5th Cir. 1995) (en banc). 
Therefore, this inquiry points to the application of general maritime law.

2.      Substantial
relationship to traditional maritime activity

The final inquiry involves an assessment of “whether
the ‘general character’ of the ‘activity giving rise to the incident’ shows a
‘substantial relationship to traditional maritime activity.’”  Grubart,
513 U.S. at 534 (quoting Sisson, 497 U.S. at 365, 364 & n.2).  The
focus here is on the tortfeasor’s activity.  Id. at 539-40.  “The relevant activity
‘is defined not by the particular circumstances of the incident, but by the
general conduct from which the incident arose.’”  Marine Transp. Corp.,
221 S.W.3d at 145 (quoting Sisson, 497 U.S. at 364).  “This test focuses
on the ‘comparison of traditional maritime activity to the arguably maritime
character of the tortfeasor’s activity in a given case.’”  Id. (quoting Grubart,
513 U.S. at 542).

Niche contends that
the substantial relationship standard is not satisfied here because
“[o]perating a land-based vacuum truck has little connection with maritime
navigation and commerce.”  We disagree with Niche’s description of the relevant
activity.  The “general character” of the “activity giving rise to the
incident” in this case is the provision of equipment for use in the cleaning and
maintenance of a vessel in navigable waters.  See Poret v. La. Lift &
Equip., Inc., No. Civ.A. 02-3642, 2003 WL 1338726, at *2 (E.D. La. March
13, 2003) (“The problem with Defendant’s argument . . . lies in its description
of the activity . . . .  The activity is not simply the lease of a forklift,
but leasing a forklift to a stevedoring company for use in vessel loading and unloading. 
The unloading of a ship’s cargo is a traditional maritime activity.”).

Like the Fifth
Circuit, we have little difficulty in concluding that “the repair and
maintenance of a [vessel] . . . on navigable waters is certainly a traditional
maritime activity.”  Coats, 61 F.3d at 1119.  Additionally, “[p]roviding
compensation for shipboard injuries is a traditional function of the admiralty
laws.”  Id. (citing Sisson, 497 U.S. at 368-75) (Scalia, J.,
concurring)).  Under these circumstances, “the activity giving rise to [the] .
. . accident has a sufficient connection to traditional maritime activity to
support exercise of . . . admiralty tort jurisdiction.” Id.; cf. Abt
v. Dickson Co. of Tex., 251 Fed. Appx. 293, 294-95 (5th Cir. 2007) (Admiralty
jurisdiction did not apply to action by crane operator who was injured while
moving crane along dock at a time when “there were no vessels on or near the
dock;” argument for applying general maritime law “would be considerably
stronger” if operator “[h]ad . . . actually been servicing a vessel when this
incident occurred . . . .”).[2]

We overrule Niche’s
fourth issue.

Conclusion

We affirm the trial court’s judgment.

 

                                                                                    

                                                                        /s/        William
J. Boyce

                                                                                    Justice

 

 

 

Panel consists of Chief Justice
Hedges and Justice Boyce.  (Yates, J., not participating).

 









[1] 
Expert testimony recounting hearsay that was relied upon in forming an expert
opinion is subject to an objection that the risk of unfair prejudice
substantially outweighs the probative value of such testimony.  See Sosa,
961 S.W.2d at 427 (citing Tex. R. Evid. 403).





[2] 
In arguing that general maritime law does not apply here, Niche relies heavily
upon Woessner v. Johns-Manville Sales Corp., 757 F.2d 634 (5th Cir.
1985); Niche also invokes Pittsburgh Corning Corp. v. Walters, 1 S.W.3d
759 (Tex. App.—Corpus Christi 1999, pet. denied), which follows Woessner. 
We note that Woessner applied a four-factor test for determining substantial
relationship established in Kelly v. Smith, 485 F.2d 520, 525 (5th Cir.
1973).  The Fifth Circuit subsequently has observed that the approach it
employed in Kelly “was rejected by the Supreme Court in Grubart.” 
Coats, 61 F.3d at 1118.  Therefore, we apply the Fifth Circuit’s post-Grubart
teaching in Coats.